# EXHIBIT A

| | |
|---|---|
| DISTRICT COURT, CITY AND COUNTY OF DENVER STATE OF COLORADO<br>Court Address:<br>1437 Bannock Street<br>Denver, CO 80202 | DATE FILED: August 7, 2019 5:19 PM<br>FILING ID: 4E90BB7FA1A17<br>CASE NUMBER: 2019CV33037 |
| Plaintiff:<br><br>AKIVA MEYER RABINOWITZ, a/k/a AKIVA THOMAS, DO<br><br>v.<br><br>Defendants:<br><br>THE BOARD OF REGENTS OF THE UNIVERSITY OF COLORADO, THE UNIVERSITY OF COLORADO SCHOOL OF MEDICINE, GRADUATE MEDICAL EDUCATION PROGRAM and HCA-HealthONE, LLC, a Colorado corporation, Laura Webster M.D., in her official and individual capacities, and Carol Rumack, M.D., in her office and individual capacities. | ▲ **COURT USE ONLY** ▲<br><br>Case No.<br><br><br>Courtroom: |
| Attorneys for Plaintiff:<br><br>Patricia S. Bellac (#22447)<br>PATRICIA S. BELLAC LAW FIRM, LLC<br>4845 Pearl East Circle, Suite 101<br>Boulder, CO 80301<br>Telephone:  303-442-5111<br>Fax:  303-417-6381<br>E-mail:  psb@psblawfirm.com | |
| **COMPLAINT AND JURY DEMAND** | |

COMES NOW, Plaintiff Dr. Akiva Rabinowitz, DO, by and through his counsel of record, Patricia S. Bellac, Patricia S. Bellac Law Firm, LLC, for his Complaint against the Regents of the University of Colorado, the University of Colorado School of Medicine, Graduate Medical Education Program and the Anschutz Medical Campus, and HCA-HealthONE, LLC d/b/a Rose Medical Center, states and alleges as follows:

## I.    PARTIES, JURISDICTION AND VENUE

1.      The Plaintiff, Dr. Akiva Rabinowitz, DO is and at all times pertinent hereto a resident of the State of Colorado currently residing at 3539 Decatur Street, Denver, Colorado 80211.  In 2019, Dr. Rabinowitz changed his name to Akiva Thomas and he is now known by that name for all purposes.  In this complaint, Rabinowitz is used because that was his name at the time of all relevant events.

2.      The Board of Regents of the University of Colorado ("Board of Regents") is a body politic of nine elected regents charged under the Colorado constitution, section 12 of Article IX, with the general supervision of the University and the exclusive control and direction of all funds of and appropriations to the University, unless otherwise provided by law.

3.      The University of Colorado is a State of Colorado institution of higher education under Colorado Constitution section 5 of Article VIII.

4.      The University of Colorado School of Medicine operates a Graduate Medical Education Program ("CUGME Program"), a State of Colorado program of higher education at its Anschutz Medical campus located at 13001 East 17th Place, in Aurora, Colorado.

5.      HCA HealthONE, LLC is a Colorado limited liability company with a principal office street address of 4900 S. Monaco Street, Suite 380, Denver, CO  80237.  It is registered with the Colorado Secretary of State and conducts business in Colorado.

6.      Under an affiliation agreement with HCA-HealthONE, LLC ("HCA-HealthONE"), the Colorado Health Foundation ("TCHF") has responsibility for certain accredited Graduate Medical Education programs operating within HCA-HealthONE hospitals as an income generating program.

7.      In a joint venture with HCA-HealthONE d/b/a Rose Medical Center ("RMC") and HCA-HealthONE d/b/a TCHF, the University's School of Medicine CUGME Program operated the RMC Family Medicine Residency Program (the "Training Program" or "the program") to employ doctors working in the RMC Family Medicine Clinic ("Clinic") until the closure of the residency program in June 2018.

8.      The program operated to the financial benefit of both the University of Colorado School of Medicine (UCSOM) and HealthONE in receiving direct and indirect GME funding from the various federally funded reimbursement programs.

9.      Dr. Rabinowitz was a paid resident of the Training Program working in the Clinic under a joint employer relationship between the CUGME Program, HCA-HealthONE d/b/a Rose Medical Center and HealthONE, d/b/a/ The Colorado Health Foundation.

10.     The three entities were jointly responsible for the Training Program as what was known as the "GME Team," or "Big Three."

11.     At all times relevant to this action, Defendant Laura Webster, M.D. held the position of the Programs Director or was acting in that capacity.

12.     Dr. Webster was appointed to her position despite the fact she did not meet ACGME Common Program Requirements and was never approved by the Graduate Medical Education Council at UCSOM, as required by the CUGME "Program Director Qualifications, Appointment & Approval."

13.    At all times relevant to this action, Defendant Carol M. Rumack was the Associate Dean of the CUGME Program whose varied responsibilities included close administration and funding concerns for the affiliated residency programs, such as RFM, chairing the Graduate Medical Education Committee, and administering disciplinary action to physicians in training at the UCSOM.

14.    The Court has jurisdiction in this matter and venue is proper in the Denver County because the Plaintiff resides in Denver, Colorado.

## II.    FACTS

### A.    Plaintiff's Employment, Subsequent Disability and Failure to Accommodate

15.    Dr. Rabinowitz worked for UCSOM and HCA-HealthONE through the RMC Family Medicine Training Program, a three-year program, from June 23, 2016 until April 6, 2018.

16.    Dr. Rabinowitz was discriminated against and denied a reasonable accommodation for his disability, then summarily terminated without cause or process in violation of his rights under the policies and procedures of the Training Program and state and federal law.

17.    Dr. Rabinowitz was terminated from the program while he was on a medical leave of absence relating to difficulties he was having with acute trauma, complicated grief and Post Traumatic Stress Disorder ("PTSD") following the traumatic death of his mother in October 2017.

18.    Dr. Rabinowitz achieved his highly competitive placement at RMC due to his laudatory academic credentials, including being a peer-reviewed author with an extensive biomedical research background in cognitive neuroscience and graduating at the top of his medical school class. His standardized examination scores on national medical licensing exams placed him in the 90th percentile of medical students nationally. The dean of his medical school gave Dr. Rabinowitz her "highest recommendation," for continued success in graduate medical training.

19.    Dr. Rabinowitz successfully completed his first year in the program, as a "rising star" as he was referred to in his June 2, 2017 performance review and promoted to his second year.

20.    Dr. Rabinowitz's evaluations contain many very positive observations and comments, at all relevant times in the program. Within his first weeks at the Training program, he was noted to have "demonstrated great communication skills and maturity," and capable of "great change in response to feedback." His medical decision making was lauded as "easily on par" with residents 1- or 2-years ahead of him. He was noted to engage in "outstanding teamwork," and to "demonstrate an excellent amount of genuine empathy and compassion for his patients."

21.     As part of a standardized assessment taken by 1st and 2nd year Family Medicine residents to compare their performance to peers nationally, the In-Training Exam (ITE), Dr. Rabinowitz scored within the top 10% of all residents nationwide and generally outperformed his peers.

22.     In March 2017, Dr. Rabinowitz's previously healthy 53-year-old mother, his sole parent, was unexpectantly diagnosed with stage four cancer.  He moved her across the country to his home to act as her sole care provider.

23.     From her period of diagnosis in March 2017 until her death in October 2017, Dr. Rabinowitz continued to exhibit a high level of competency in patient care at RFM and dutifully attended his rotations while caring for his terminally ill mother.

24.     Upon moving his mother back to Colorado in April of 2017 and returning almost immediately to his training obligations, Dr. Rabinowitz reached out to his faculty mentor, Dr. Vanessa Rollins, for mental health resources, a request she later admitted she had just ignored or failed to follow through on.

25.     Dr. Rabinowitz soon thereafter, in May 2017, engaged in community-based counseling to help him manage both his highly stressful work and home lives.

26.     In July 2017, Dr. Rabinowitz reported to his then close adviser, Dr. Webster, he was experiencing anxiety and panic attacks at work and was sent home early on two occasions.

27.     Dr. Rabinowitz's exceptional capacity to administer a high level of care was nonetheless evident as of September 2017, when the program elected to allow him to achieve "batching privileges," requiring reduced oversight from the faculty to engage in patient care in the Clinic. This is normally reserved for 3rd year residents, and Dr. Rabinowitz achieved this distinction earlier than any resident in the program's history.

28.     Dr. Rabinowitz's ability to balance the personal challenge of caring for his gravely ill mother came to a head for him when she passed in his presence in the early morning hours on October 24, 2017, a very personal and deeply traumatic event in the precipitous and unexpected manner it occurred.

29.     Dr. Rabinowitz took two weeks of vacation leave (November 1-14, 2017) to grieve and during that time had a previously planned surgical procedure at RMC on November 7, 2017.

30.     Dr. Rabinowitz was erroneously scheduled for a follow-up appointment the day after his surgery at 7:30 a.m. which he presumed was to check his bleeding wounds.  But for the error of a staff member in the surgeon's office, he would not have appeared at RMC that day.

31.     The surgeon's office was adjacent to the work room of the RMC inpatient residents.

4

32.     A fellow resident observed Dr. Rabinowitz that morning as "not acting as himself" and accompanied him to the surgeon's office front desk.

33.     Dr. Rabinowitz was told that the appointment was made in error, that he did not need follow up until several days later.  The resident then helped plan for Dr. Rabinowitz to safely return home.

34.     Based on that incident of off-duty conduct, Dr. Webster erroneously perceived Dr. Rabinowitz to have a substance abuse problem and referred him for treatment with the Colorado Physical Health Program (CPHP).

35.     Dr. Rabinowitz went out on family medical leave ("FML") from November 15 until December 12, 2017 when CPHP cleared him to return to the Clinic.

36.     Upon his return, Dr. Webster placed him on a Focused Review, a form of discipline, because of what she perceived as a "failure to maintain [his] mental health," despite the fact he had appeared at RMC off-duty at his surgeon's direction one-day post operation.

37.     Dr. Webster's actions in punishing Dr. Rabinowitz for engaging in off-duty conduct was improper and concerning to Dr. Rumack, who at all times relevant was Dr. Webster's supervisor.

38.     Dr. Rumack expressed at the time (after Dr. Rabinowitz had signed the Focused Review) her concern that the incident did not necessarily indicate a deficiency in performance but that the RMC program had not afforded Dr. Rabinowitz with adequate time off.

39.     Dr. Rabinowitz successfully attended counseling, performed evaluative testing and submitted to drug testing while under CPHP's care.

40.     CPHP concluded that what occurred on November 7, 2017 "was a one-time incident" and communicated this to Dr. Webster on December 12, 2017 stating that they found "no evidence Dr. Rabinowitz [sic] is suffering from a medical or psychiatric disorder, including a substance abuse disorder …".

41.     CPHP providers determined Dr. Rabinowitz was "having an appropriate grief reaction to the acute, traumatic death" of his mother.

42.     When Dr. Rabinowitz returned to the Training Program, he performed his job duties without incident during the holiday season but began having difficulties with maintaining his temperament and focus in mid-January 2018.

43.     Dr. Rabinowitz was suffering from not only complex grief but also symptoms begetting an emerging diagnosis of post-traumatic stress disorder (PTSD) relating to the trauma of his mother's death.

44.     Acute traumatic stress is known to have the potential to develop into Post-Traumatic Stress Disorder, especially in situations such as what Dr. Rabinowitz faced.

45.     PTSD is a mental illness predominantly characterized by markedly abnormal level of reactivity and diminished executive-cognitive functioning which governs healthy decision-making behavior.

46.     In mid-January 2018, Dr. Rabinowitz began experiencing flashbacks, feelings of guilt, and other emotional disturbances due to the trauma he had experienced weeks prior with the death of his mother and his actions to withdraw life-support.

47.     Dr. Rabinowitz reported these difficulties to Dr. Vanessa Rollins, Ph. D, who was his adviser at the time to mitigate the potential effects on his job performance.

48.     Despite his immense personal difficulties, his performance was strong on outside rotations in Advanced Obstetrics in December 2017 and General Surgery during January 2018. His Advanced Obstetrics supervisor passed him in all categories, said he was an "excellent physician" and that the two recent deaths in his family did not interfere with his experience.  His General Surgery supervisor reported that he was hard-working, had a generous fund of knowledge, and was "kind to patients and very helpful in every regard."

49.     In addition to talking to Dr. Rollins, Dr. Rabinowitz also, on several occasions, let his supervisors and team know he was struggling – that his temperament at the time was being strongly colored by his outstanding grief and that he was considering the need for additional time off.

50.     One of the doctors he reported to, Dr. Tyler Ladue, had a management style which was triggering Dr. Rabinowitz to feel overwhelmed.

51.     Dr. Rabinowitz's efforts to express his concerns and mental health medical needs to his supervisors, in particular Dr. Ladue, was interpreted as a job performance deficiency, and his mental health challenges a threat to the workplace rather than a condition which garnered legal protections - a mental health impairment caused by his disability.

52.     Dr. Rabinowitz's efforts to receive accommodation to help him perform his job duties were ignored by Dr. Webster and the Training Program and RMC's leadership which further exacerbated his symptoms.

53.     An example of this is when Dr. Rabinowitz made a simple request that Dr. Ladue only contact him in relation to topics relevant to administering safe and quality care to the program's patients as a measure to allow him to better manage the stress of his job.

54.     That request led to Dr. Rabinowitz being admonished in his next performance review.

55.     In addition to his personal challenges, there was ongoing tension rising among the faculty because it was becoming clear that the Training program was closing after June 30, 2018, creating uncertainty among the residents and staff as to their jobs and professional futures.  The Training Program leaders were becoming aware that they would have to find substitute

placements for all of the returning residents, which they ultimately did for everyone but Dr. Rabinowitz.

56.    On January 11, 2018, while practicing in the Clinic, Dr. Rabinowitz made a simple error in processing a prior authorization for a patient to receive a Lidocaine patch and immediately reported his error to Dr. Webster in addition to other steps to address the issue.

57.    Within moments of committing the error, Dr. Rabinowitz was approached by the RMC's Lead Nurse, Cheryl Murphy, who was immediately aggressive with him despite his established record of highly professional behavior and Ms. Murphy's personal endorsement of his batching privileges.

58.    Ms. Murphy, who oversaw HCA-HealthONE's role in the RFM clinic operations, reported to the hospital that Dr. Rabinowitz was beginning to act "highly abnormal" and might not be fit to work.

59.    These specific behaviors correlate closely with the emerging disabling symptoms of Post-Traumatic Stress Disorder which include increased reactivity, making poor in-the-moment decisions, and decreased ability to tolerate "normal" work stressors.

60.    At no point, was Dr. Rabinowitz afforded an interactive process under the University's Disability Accommodation policy, but rather, he was investigated for Medicare fraud based on that one, isolated incident, which Dr. Webster describes in Dr. Rabinowitz's January 16th, 2018 training review was "a non-issue" to the Training Program but was escalated to the highest levels of the hospital administration "behind [her] back." Dr. Webster shared the information about Cheryl Murphy's back-handed actions against Dr. Rabinowitz despite already being aware of the tense relationship occurring between Dr. Ladue and Dr. Rabinowitz.

61.    On January 15, 2018, Dr. Rabinowitz engaged in a text message exchange with his Chief Resident asking for coverage to attend a therapy session for an hour and a half on his upcoming February 2018 rotation, senior admitting resident on the inpatient RFM service, arguably the most difficult rotation at the Training Program.

62.    Dr. Rabinowitz's schedule had not been blocked off and as he explained "If I don't see my therapist I am going to crash and burn without a doubt.  I can barely handle a single TE [telephone encounter with a patient] right now."

63.    Dr. Ladue was objecting to Dr. Rabinowitz's request to regularly see his therapist on a weekly basis for an hour despite working an 80-hour per week schedule.

64.    Dr. Ladue's actions were in direct violation of the University's Leave Policy as well as the ACGME rules which reads: "**Well-Being** – Programs must provide the Resident with the opportunity to attend medical, mental health and dental care appointments, including those scheduled during their working hours.

65.    Dr. Rabinowitz's request was legally protected under the University's leave policy and should have been granted as FML

66.     On January 16, 2018, Dr. Rabinowitz met with Dr. Webster for his bi-annual performance review.

67.     In that meeting, Dr. Rabinowitz discussed the difficulty he was having with Dr. Ladue in not being heard when he attempted to communicate his difficulty with keeping up with email and text communications in his job among other concerns.

68.     Dr. Rabinowitz explained to Dr. Webster he was seeing a psychologist, that his mental health was "colored by a background of grief," and described his mental health limitations in communication as relating to "limited frustration tolerance."

69.     Dr. Rabinowitz further explained that Dr. Ladue's management style was exacerbating his symptoms and so he was making accommodation in prioritizing the emails and text communications he received on a daily basis as a means of coping.

70.     Dr. Webster relayed dissatisfaction on the part of Dr. Ladue who interpreted Dr. Rabinowitz to be acting insubordinate.  This was despite the fact that Dr. Rabinowitz specifically explained to Dr. Ladue he was having difficulties with processing his grief which was affecting his temperament and ability to cope.

71.     Dr. Webster acknowledged that Dr. Ladue can be a difficult manager yet failed to afford Dr. Rabinowitz his legally protected rights under the University's policies for an interactive process to explore reasonable accommodations for Dr. Rabinowitz's  mental health impairment.

72.     Dr. Webster was knew or reasonably should have known, from her communications with CPHP, that Dr. Rabinowitz suffered from complicated grief, a diagnosis which includes symptoms of anxiety, insomnia, panic attacks, depression, and trauma. In late February, he was diagnosed as suffering from PTSD.

73.     Dr. Rabinowitz specifically requested to be accommodated by the program in the form of a modification in expectations as immediacy of his communications to avoid becoming overwhelmed by Dr. Ladue but his requests were ignored.

74.     Rabinowitz's stated difficulties and requests for reasonable accommodation were framed as a reluctance to do his job,- a performance deficiency- instead of affording him an interactive process and reasonable accommodation.

75.     Dr. Rabinowitz received no offer of an interactive process and no accommodation despite his rights under the Family and Medical Leave Act, the Americans with Disabilities Act ("ADA") and the Colorado Anti-Discrimination Act ("CADA") for reasonable accommodation which are codified in the University's policies.

76.     In the January 16, 2018 performance review meeting, Dr. Webster told Dr. Rabinowitz that he would be put on an individualized learning plan ("ILP"), a form of discipline for his "communication difficulties," a further attempt by the program to mischaracterize the disabling features of his grief as a professionalism issue with his performance as a physician.

77.     Dr. Webster assured Dr. Rabinowitz that the ILP would be "nothing formal," that "everyone has one they are working on," and that aside from a few "speedbumps in the road," he was doing well.

78.     Dr. Rabinowitz's difficulties with Dr. Ladue aside, Dr. Rabinowitz continued to perform at a high level - his performance reviews at the time establish he otherwise was performing at or above expectations.

79.     On January 29, 2018, Dr. Rabinowitz sent a text message to Dr. Ladue in which he explained he had been monitoring his email and prioritizing demands because he was feeling "very compromised from [his] grief and trauma and perpetually on the border of not being able to work."

80.     That text message exchange apparently angered Dr. Ladue who then followed up with Dr. Webster to address the matter as a performance issue.

**B.      Purported Suspension Imposed In Retaliation for Protected Activity And Medicare Fraud Investigation**

81.     Dr. Webster met with Dr. Rabinowitz on January 31, 2018.  In that meeting, she told him she was placing him back on FML to address his worsening mental health and give him time to focus on his wellness.  She did not say that she was suspending him or that he was being subjected to disciplinary action.

82.     In that meeting, Dr. Rabinowitz specifically asked Dr. Webster if the leave was the same as he took in December (FML) and was told that "yes, it was."

83.     It was Dr. Rabinowitz's understanding based on what he was told that he was being placed on medical leave to allow him time to address his ongoing complicated grief and trauma.

84.     This is consistent with Dr. Webster sending an email to the residency staff on February 1, 2018 explaining Dr. Rabinowitz was going to be out on "FMLA" and consistent with what appears to have been discussed with Dr. Rumack and Dr. Rabinowitz's care providers at CPHP around that time.

85.     Based on evidence provided in response to a Colorado Open Records Act request, Dr. Webster and Dr. Rumack conferred and exchanged emails and documents at various times between January 30, 2018 and February 15, 2018, and together, created a "suspension letter" was created by Dr. Webster.

86.     The fictitious suspension letter was placed in Dr. Rabinowitz's file without his knowledge.

87.     By fraudulently creating this suspension documentation and not informing Dr. Rabinowitz of it, Dr. Rabinowitz was induced to take leave under false pretenses and deprived of

the right to appeal his suspension, a right that he would otherwise have based upon his contract and the Colorado constitution.

88.     The fictitiously created "suspension letter" (the "False Suspension Letter")  was then used as "key" evidence to terminate him from the Training Program, in April 2018.

89.     The False Suspension Letter is evidence that the University's claimed reasons for failing to accommodate, suspending and terminating Dr. Rabinowitz are pretextual.

90.     Dr. Rabinowitz first learned of the False Suspension Letter after he had already been terminated.

91.     A review of the internal properties of the .pdf document saved to it by the word processing program, the metadata, reveal that the letter created and finalized between February 13-14, 2018, the later date exactly corresponding with an email Dr. Webster sent for it to be placed in Dr. Rabinowitz's personnel file without his knowledge.

92.     The date appearing on the letter, January 31, 2018, is backdated.

93.     The False Suspension Letter was includes allegations of performance deficiencies which are not true, including citing "multiple reports of unprofessional behavior" yet that allegation is not supported by the evidence with the only conflict being with Dr. Ladue.

94.     The University has in place specific procedures for addressing resident performance under its Remediation and Disciplinary Action Policy.  Dr. Rabinowitz was never afforded those rights.

95.     The policy reads that immediate suspension from clinical responsibilities without prior notice or a probationary/remedial period can only occur in circumstances involving "significant deficiencies related to patient safety."

96.     The grounds given in support of a suspension in the fictitious suspension letter are "deficiencies in professionalism and interpersonal communications."

97.     The letter does not state, and there is no evidence to show, that Dr. Rabinowitz presented any danger to patients.  Rather, it is clear from his performance evaluations and clinical record that as a physician Dr. Rabinowitz was performing at or above expectations and that he values patient care.

98.     The facts did not support immediate suspension.

99.     The Defendants acted with malice and indifference to Dr. Rabinowitz's rights by creating pretext to support their discriminatory actions against him not based on legitimate performance concerns but because he was mentally impaired due to his disability.

100.     In comparison, another resident in the Training Program who did not have an identified mental health impairment was given considerable leeway under the University's

Physician Impairment Policy to accommodate performance issues he was having which related to real substance abuse.

101.    Dr. Webster has stated, in comparing situations, that she was not "afraid" of Dr. Rabinowitz's nondisabled peer which she implied to mean she perceived Dr. Rabinowitz to be a "threat" because of his cry for help when he was having performance difficulties because of his mental health disability.

102.    Nothing Dr. Rabinowitz said, as set forth above, indicated a bona fide threat to the physical safety of Dr. Webster or anyone else.

103.    Dr. Rabinowitz's honest expressions of his mental health impairment were falsely and without support perceived as imposing a "threat" justifying in Defendants' mind discriminatory and disparate treatment against him as an employee and a student of the Training Program in violation of the University's policies and procedures, including without limitation its Disability Accommodation Policy, and state and federal law.

104.    Without merit, Dr. Rabinowitz was subject to scorn and retaliatory response rather than receive the much-needed help he deserved and was legally entitled to.

**C.    Illegally Rendered and Unsubstantiated Termination Decision:**

105.    To the best of Dr. Rabinowitz's knowledge and with support in his file, he was placed on FML effective February 1, 2018 and again referred to CPHP.

106.    On February 27, 2018, CPHP informed Dr. Webster that Dr. Rabinowitz was suffering from complicated grief and, that although he was feeling better, he had agreed to take an additional 30 days, the month of March, off from training to continue to get well before he returned to the clinical setting.

107.    Dr. Rabinowitz was scheduled for a follow up appointment on March 15, 2018 and based on CPHP's recommendation his leave was extended until April 1, 2018.

108.    When Dr. Webster reached out to CPHP on or about April 6, 2018 to receive CPHP's approval for Dr. Rabinowitz's return, she was informed he was not able to return quite yet.

109.    On information and belief, Dr. Rabinowitz's care provider was on vacation at the time and that is why the paperwork for his return was not available.

110.    No interactive process was ever offered to explore whether Dr. Rabinowitz would be able to return on a date certain soon thereafter, as is required by CADA and the ADA as a form of reasonable accommodation.

111.    On April 6, 2018 Dr. Rabinowitz was summarily terminated from the Training Program.

112.    The termination decision was based, in part, on Dr. Rabinowitz's exhaustion of FML and in part based on a perceived substance abuse problem following an incident on March 14, 2018 when Dr. Rabinowitz was required to report to work during his medical leave of absence.

113.    It was observed that Dr. Rabinowitz appeared to "not be himself" that day.

114.    As with the incident in November 2017, it was again assumed that Dr. Rabinowitz was in an intoxicated state when he appeared at RMC in an altered emotional state while on medical leave on Wednesday, March 14, 2018.

115.    The termination letter reads as the bases for the decision "repeated episodes of intoxication" and the loss of 3 months of clinical experience (job protected FML Leave).

116.    Dr. Webster erroneously states in the termination letter that Dr. Rabinowitz was under Focused Review when he was terminated from the Training Program.

117.    The only Focused Review in Dr. Rabinowitz's personnel file is the one issued in December 2017 from which he was released on January 16, 2018.

118.    The Focused Review letter specifically reads that any further discipline could only be imposed "[s]hould you fail to meet the terms of your focused review at any point in time during the review period," (i.e., through December 31, 2017).

119.    Dr. Rabinowitz was asked by the RMC program leadership to attend two meetings on March 14, 2018, one a strategy-focused resident meeting at RMC during the day and the Graduate Medical Education Committee ("GMEC") meeting later that evening at the CU Anschutz facility.

120.    This was despite the fact Dr. Rabinowitz was known to be on FML for medical reasons relating to his mental health.

121.    At the time, Dr. Rabinowitz's PTSD symptoms and complex grief had become exacerbated by the approaching anniversary of his mother's diagnosis and he was unable sleep to due to raging anxiety and flashbacks.

122.    Dr. Rabinowitz was working with his treatment providers to adjust his medications to alleviate the symptoms and stabilize his mental state.

123.    When Dr. Rabinowitz appeared at RMC, as requested, he was extremely vulnerable emotionally and unable to articulate that he was in the midst of a mental health crisis because after three sleepless nights he had no awareness that this was what was going on.

124.    Dr. Webster was aware that at the time Dr. Rabinowitz was subject to substance abuse testing through CPHP, all results of which confirmed he was not abusing drugs.

125.    Dr. Rabinowitz was overcome by grief and symptoms of PTSD, and therefore not of sound mind but his affect was not related to the abuse of drugs. Dr. Rabinowitz was not "intoxicated" or "impaired" by drugs that day as erroneously perceived.

126.    An emergency room was literally steps away at the campuses of two separate hospital facilities, yet he was never offered medical help, asked to participate in an emergent evaluation or drug testing when perceived as being under the influence.

127.    The ACGME mandates under Policy VI.C.1.e.3 that the Training program shall "provide access to confidential, affordable mental health assessment, counseling, and treatment, including access to urgent and emergent care 24 hours a day, seven days a week."

128.    The callous actions of the Training Program staff in not providing Dr. Rabinowitz with the assistance to which he was entitled, denied him of any emergent evaluation - information could have assisted or exonerated him.

129.    In February, during his treatment with CPHP, Dr. Thomas submitted to on-demand urine drug testing the results of which were negative for substance abuse.

130.    Dr. Webster was aware of this, that no drug abuse had been substantiated, from her communications with CPHP on February 27, 2018.

131.    Dr. Rabinowitz was subject to random drug testing by CPHP throughout his medical leave, including hair sample testing just after the March 14, 2018 incident with no positive results ever recorded.

132.    The hair sample screening included testing for marijuana, opiates and opioids, benzodiazepines, alcohol, sleeping pills, PCP, ketamine and barbiturates with all test results being negative. The testing would have detected any drug use for the 3-6 months prior to the screening.

133.    At no time did Dr. Rabinowitz test positive for drug abuse, yet he was labeled and accused of being a drug abuser.

**D.    Termination Violated the Training and Denied Due Process**

134.    At all times relevant, Dr. Rabinowitz, the University, acting through the CUGME Program, and HealthONE d/b/a RMC as the affiliated hospital were parties to a Training Agreement ("Training Agreement") signed by Dr. Rabinowitz, on April 15, 2017.

135.    The Training Agreement, effective July 1, 2017 through June 30, 2018, formed an enforceable contract setting forth the terms and conditions of the Training Program and the parties' respective obligations therein.

136.    Under the Training Agreement, Dr. Rabinowitz was expressly provided "the right to the processes of promotion, evaluation, probation, remediation, suspension, non-renewal, dismissal and grievance as described in the [GME] Policies and Procedures."

13

137.   Those policies and procedures, including without limitation the GME Remediation and Disciplinary Policy, Leave Policy, and Physical Impairment Policy, were not complied with in addressing Dr. Rabinowitz's mental health limitations when performing his job duties at the clinic and otherwise participating in the Training Program.

138.   Similarly, the GME policies and procedures were not complied with by the Defendants in making the decision to terminate Dr. Rabinowitz from the Training Program.

139.   The Training Agreement, under paragraph 15, afforded Dr. Rabinowitz the protection of the University's policy on Disability Accommodation which protection was denied with no interactive process being offered and no reasonable accommodations being provided.

140.   The Training Program Leadership, and HCA-HealthONE as a joint employer, had a duty to explore reasonable accommodations and to take additional remedial steps before terminating Dr. Rabinowitz from the program.

141.   Moreover, the Training Program was accredited by the Accreditation Council of Graduate Medical Education (hereinafter "ACGME") and subject to its common program requirements in training and preparing resident physicians (the "ACGME Requirements").

142.   The obligations of the University and HCA-HealthONE, LLC d/b/a Rose Medical Center specifically included, under paragraph 14 of the Training Agreement, the obligation to abide by the requirements to provide adequate and appropriate Resident/Fellow working conditions set by the ACGME.

143.   A significant deficiency in the program was the appointment of Dr. Webster as Program Director as she was unqualified for the position given a lack of experience and did not meet the ACGME program requirements.

144.   Dr. Webster and others in the Training Program's Leadership ostensibly perceived Dr. Rabinowitz to be abusing drugs yet failed to afford him the protections of the University's Physician Impairment Policy and Drug Screen Policy by providing him with emergent evaluation and drug screening.

145.   Rather than follow the University's policies and procedures, they acted on prejudicial assumptions without evidence to substantiate their claim that Dr. Rabinowitz had a drug problem.

146.   The Physician Impairment Policy expressly provides that Dr. Webster, as Program Director, was required to discuss her concerns with Dr. Rabinowitz in demanding compliance with the policy and exploring options for him to seek help.

147.   The Physician Impairment Policy specifically states that Dr. Webster was prohibited from making a clinical diagnosis of substance use/abuse or accuse Dr. Rabinowitz of using substances.

148.    Rather than have Dr. Rabinowitz submit to emergent evaluation which could have ruled out substance abuse, in accordance with his rights under the University's Drug Screening Policy and the Physician Impairment Policy, Dr. Webster and Dr. Rumack acted with malice and/or reckless indifference to the rights of Dr. Rabinowitz.

149.    The University deprived Dr. Rabinowitz of rights that he should have been afforded had he actually suffered from substance abuse problems.  The University's Remediation and Disciplinary Action policy states that "termination is typically preceded by probation . . ." and that "drug or alcohol abuse" is an item that "require[s] that a [resident] be put on probation . . . ."

150.    Dr. Rabinowitz was never placed on probation nor allowed the procedural rights available to challenge such a decision which would have allowed him to prove he was not abusing drugs.

151.    Plaintiff had a valid expectancy that his continued employment with the Training Program and successful completion of the same would be governed by the policies, guidelines and criteria promulgated by Defendant University, its School of Medicine Graduate Medical Education Program and the ACGME Program Requirements.

152.    ACGME program requirement VI.B.6 required that the Training Program provide a professional, respectful, and civil environment that is free from mistreatment, abuse, or coercion of students, residents, faculty and staff.

153.    Rather, than afford Dr. Rabinowitz his legally protected rights in addressing his mental health, the Training Program's Leadership's acted in an emotionally abusive manner with malicious and/or reckless indifference.

154.    That their actions were unsupportable, arbitrary and capricious, is supported by the fact that Dr. Rabinowitz was offered reinstatement after a hearing before the GME Grievance Review Panel and offered probation and remediation on appeal.

155.    Dr. Rabinowitz has not been able to return to the University and complete his residency because the University has been unwilling to appoint him to a suitable comparable training program.

156.    Dr. Rabinowitz was informally offered reinstatement to a lesser program in an HCA-HealthONE affiliated hospital under a leadership heavily influenced by Dr. Webster and Dr. Rumack.

157.    Both Dr. Webster and Dr. Rumack have spread untrue gossip, rumors and innuendo about Dr. Rabinowitz that has been highly prejudicial to his ability to be successful in a HCA-HealthONE affiliated program.

158.    The University has taken no action to cure the actions of Drs. Webster and Rumack which remain ongoing and involve slanderous and defamatory statements about Dr. Rabinowitz and his fitness to practice medicine, including rumors that he is unfit to be a doctor

and a "drug addict," causing irreparable and permanent damage to his professional reputation and ability to successfully and safely return to the University.

159.    Dr. Rabinowitz filed charge No. FE2019332354, 32A-2019-00021 against the University, with the Colorado Civil Rights Division on October 1, 2018, alleging discrimination on the basis of disability, religion, gender and sexual orientation, and retaliation in violation of the ADA, Title VI of the Civil Rights Act of 1964 and the Colorado Anti-Discrimination Act.  He has received Right to Sue letters from the CCRD, on May 20, 2019 and the EEOC, on July 21, 2019.  This lawsuit is timely under both Right to Sue letters.

160.    Dr. Rabinowitz filed charge No. FE2019292597, 32A-2019-00022 against the University, with the Colorado Civil Rights Division on October 1, 2018, alleging discrimination on the basis of disability, religion, gender and sexual orientation, and retaliation in violation of the ADA, Title VI of the Civil Rights Act of 1964 and the Colorado Anti-Discrimination Act.  He has received Right to Sue letters from the CCRD, on May 20, 2019 and the EEOC, on July 21, 2019.  This lawsuit is timely under both Right to Sue letters.

## III.   <u>FIRST CLAIM FOR RELIEF</u>

**Employment Discrimination Based in Violation of the Colorado Anti-Discrimination Act ("CADA") and Title VII of the Civil Rights Act of 1964, Against Defendants the University and RMC**

161.    Plaintiff incorporates all other paragraphs set forth fully herein.

162.    Defendants are "employers" subject to CADA, § 24-34-401, *et. seq.*, C.R.S. and Title VII of the Civil Rights Act of 1964, 42 USC § 2000e *et. seq*

163.    Dr. Rabinowitz was an "employee" of the Defendants under both CADA and Title VII as joint employers entitled to the protections of CADA as a qualified individual with a disability accepted into the Training Program at all times relevant to this action.

164.    Dr. Rabinowitz's mental health conditions, PTSD and complex grief, meet the definition of "disability" under the CADA, as they substantially limit one or more major life activities, including his ability to concentrate, communicate, think, sleep and correspondingly work.

165.    Dr. Rabinowitz was, at all relevant times, able to perform the essential job functions with or without reasonable accommodations and was therefore, a qualified individual with a disability in performing his job duties for the Clinic.

166.    Dr. Rabinowitz was also "regarded as" having an impairment, within the meaning of the CADA.

*167.*   As outlined above, Defendants University. and Affiliated Hospital (RMC), acting by and through HealthONE, LLC d/b/a RMC, failed to make reasonable accommodations for Dr. Rabinowitz's disability and/or engage in an interactive process as required by the Colorado Anti-Discrimination Act, §§24-34-402, *et. seq.*

*168.*   Dr. Rabinowitz was, at all relevant times, gay, Jewish and Male.

169.   Defendants engaged in discrimination and disparate treatment toward Dr. Rabinowitz by treating him less favorably than his peers because of his disability (perceived and actual), suspending him under false pretenses and without due process, not affording him the protections otherwise afforded to those with perceived substance abuse problems, and by terminating him from the Training Program without following the requirements of applicable University policies and the Colorado constitution, including its Disability Accommodation Policy, and the GME, RMC and ACGME policies and procedures.

170.   Defendants engaged in discrimination and disparate treatment toward Dr. Rabinowitz by treating him less favorably than his peers because his other protected status (Jewish, Gay, Male) by depriving him of the terms and privileges of employment enjoyed by his peers who were non-Jewish and/or straight and/or female, by refusing to accommodate his need for medical leave or other needed accommodations, not affording him the protections otherwise afforded to those with perceived substance abuse problems, suspending him under false pretenses and without due process, and terminating him from the Training Program without following the requirements of applicable University policies, including its Disability Accommodation Policy, and the GME, RMC and ACGME policies and procedures.

171.   As a result of Defendants' discriminatory actions, Dr. Rabinowitz has suffered significant economic and non-economic damages, in an amount to be determined at trial.

172.   Defendants' unlawful actions were intentional and taken with malice and/or reckless disregard or indifference to the rights of Dr. Rabinowitz and subjects RMC to punitive damages.

## IV.   SECOND CLAIM FOR RELIEF

### Employment Discrimination in Violation of the Title I of the Americans with Disabilities Act of 1990 (ADA) Against Defendant RMC

173.   Plaintiff incorporates all other paragraphs set forth fully herein.

174.   Defendant RMC is an "employer" subject to Title I of the ADA, 42 U.S.C. §§ 12101, *et. seq.*, as amended.

175.   Dr. Rabinowitz was an "employee" of RMC as the Affiliated Hospital and one of three joint employers of residents providing services under the Training Program at all times relevant to this dispute.

176.    The work performed by Dr. Rabinowitz was part of the regular business of the Clinic.

177.    In performing his job duties, Dr. Rabinowitz was required by his Training Agreement to examine patients and attend their medical needs, keep medical records and/or reports, and document his duty hours.

178.    Dr. Rabinowitz also was required to abide by RMC's policies and procedures.

179.    Dr. Rabinowitz's mental health conditions, PTSD and complex grief, meet the definition of "disability" under the ADA, as they substantially limit one or more major life activities, including his ability to concentrate, communicate, think, sleep and work.

180.    Dr. Rabinowitz was, at all relevant times, able to perform the essential job functions with or without reasonable accommodations and was therefore, a qualified individual with a disability entitled to the protections of Title I of the ADA in performing his job duties for the Clinic.

181.    Dr. Rabinowitz was also "regarded as" having an impairment, within the meaning of the ADA.

182.    As outlined above, Defendants University. and Affiliated Hospital (RMC), acting by and through HealthONE, LLC d/b/a RMC, at all times relevant to this action acted as joint employers failing to make reasonable accommodations for Dr. Rabinowitz's disability and/or engage in an interactive process as required by Title I of the Americans with Disabilities Act, 42 U.S.C. §§ 12101, et. seq, as amended.

183.    Defendants engaged in discrimination and disparate treatment toward Dr. Rabinowitz by treating him less favorably than his peers because of his disability, not affording him the protections available under  University policy for (perceived) substance dependency, suspending him under false pretenses and without due process and by terminating him from the Training Program without following the requirements of applicable University policies, including the University's Disability Accommodation Policy, and the GME, RMC and ACGME policies and procedures.

184.    RMC's Chief Medical Officer, Dr. Austin, acted with malicious intent and reckless indifference to support the termination of Dr. Rabinowitz from the CUGME program, including subjecting Dr. Rabinowitz to an investigation for "Medicare fraud" as a pretext for discrimination.

185.    As a result of Defendants' discriminatory actions, Dr. Rabinowitz has suffered significant economic and non-economic damages, in an amount to be determined at trial.

186.    Defendant RMC's unlawful actions were intentional and taken with malice and/or reckless disregard or indifference to the rights of Dr. Rabinowitz and subjects them to punitive damages.

## V.   THIRD CLAIM FOR RELIEF

### (Discrimination in Violation of Title II of the ADA Against University)

187.    Plaintiff incorporates all other paragraphs set forth fully herein.

188.    Defendant University is a state institution of higher education offering the Training Program as a public educational opportunity subject to the requirements of Title II of the ADA, 42 U.S.C. §§ 12101, *et.seq.*, as amended.

189.    Dr. Rabinowitz's mental health conditions, PTSD and complex grief, meet the definition of "disability" under the ADA, as they substantially limit one or more major life activities, including his ability to concentrate, communicate, think, sleep and work.

190.    Dr. Rabinowitz was also "regarded as" having a disability, within the meaning of the statute.

191.    Dr. Rabinowitz was, at all relevant times, able to perform the essential job functions with or without reasonable accommodations and was therefore a qualified individual with a disability.

192.    The CUGME Program discriminated against Dr. Rabinowitz by failing to provide him with equal access to the Training Program because of his disability including failing to make reasonable accommodations for his disability and/or engage in an interactive process to allow him to fully participate in, and enjoy the benefits of, the Training Program in violation of Title II of the ADA.

193.    Defendants engaged in discrimination and disparate treatment toward Dr. Rabinowitz by treating him less favorably than his peers because of his disability by not following its various policies that would have afforded him protections, suspending him under false pretenses and without due process and by terminating him from the Training Program without following the requirements of applicable University policies, including the University's Disability Accommodation Policy, and the GME, RMC and ACGME policies and procedures.

194.    As a result of Defendants' discriminatory actions, Dr. Rabinowitz has suffered significant economic and non-economic damages, in an amount to be determined at trial.

## VI.   FOURTH CLAIM FOR RELIEF

### (Public Accommodations Discrimination in Violation of CADA Against Defendants University and RMC)

195.    Plaintiff incorporates all other paragraphs set forth fully herein.

196.    Defendants University and RMC are places of public accommodation subject to CADA, §§ 24-34-601, *et. seq*, C.R.S.

197.     Dr. Rabinowitz's mental health conditions, PTSD and complex grief, meet the definition of "disability" under the ADA, as they substantially limit one or more major life activities, including his ability to concentrate, communicate, think, sleep and work.

198.     Dr. Rabinowitz was, at all relevant times, able to perform the essential job functions with or without reasonable accommodations and was therefore, a qualified individual with a disability.

199.     Dr. Rabinowitz was also regarded as having a disability, by the Defendants.

200.     Defendants discriminated against Dr. Rabinowitz based on his disability by failing to provide him with equal access to the Training Program because of his disability, including failing to make reasonable accommodations and/or engage in an interactive process to allow him to fully participate in, and enjoy the benefits of, the Training Program.

201.     Defendants engaged in discrimination and disparate treatment toward Dr. Rabinowitz by treating him less favorably than his peers because of his disability, depriving him of protections under various policies, suspending him without due process and by terminating him from the Training Program without following the requirements of applicable University policies, including the University's Disability Accommodation Policy, and the GME, RMC and ACGME policies and procedures.

202.     Defendants engaged in discrimination and disparate treatment toward Dr. Rabinowitz by treating him less favorably than his peers because his other protected status (Jewish, Gay, Male) by depriving him of the terms and privileges of employment enjoyed by his peers who were non-Jewish and/or straight and/or female, by refusing to accommodate his need for medical leave or other needed accommodations, not affording him the protections various policies, suspending him under false pretenses and without due process, and terminating him from the Training Program without following the requirements of applicable University policies, including its Disability Accommodation Policy, and the GME, RMC and ACGME policies and procedures.

203.     As a result of Defendants' discriminatory actions, Dr. Rabinowitz has suffered significant economic and non-economic damages, in an amount to be determined at trial.

204.     Defendants' unlawful actions were intentional and taken with malice and/or reckless disregard or indifference to the rights of Dr. Rabinowitz and subject RMC to punitive damages.

## VII.  FIFTH CLAIM FOR RELIEF

### Retaliation in Violation of Exercising Rights under CADA Against Defendants University and RMC

205.     Plaintiff incorporates all other paragraphs set forth fully herein.

206.    Plaintiff engaged in the protected activity of asking for reasonable accommodation for his mental health impairment, at various times as set forth more fully above.

207.    Defendants retaliated against Plaintiff by denying him his rights under the University's, GME and ACGME policies and procedures, by ostensibly placing him on disciplinary action by creating the False Suspension Letter  to support his termination, and in ultimately terminating him from the Training Program and his work with the Clinic without cause and again in violation of the established policies and procedures.

208.    Defendants would not have taken those said adverse employment actions against Dr. Rabinowitz but for the fact that he engaged in the protected activity of seeking reasonable accommodation for his disability.

209.    As a result of Defendants' retaliatory actions, Dr. Rabinowitz has suffered significant economic and non-economic damages, in an amount to be determined at trial.

210.    Defendants' unlawful actions were intentional and taken with malice and/or reckless disregard or indifference to the rights of Dr. Rabinowitz and subject RMC to punitive damages.

## VIII.  <u>SIXTH CLAIM FOR RELIEF</u>

### Discrimination in Violation of Section 504 of the Rehabilitation Act of 1973 Against Defendants University and RMC

211.    Plaintiff incorporates all other paragraphs set forth fully herein.

212.    The Training Program was supported in part by federal grants and funding programs.

213.    To the best of Dr. Rabinowitz's knowledge, RMC also received federal financial assistance to operate the Clinic.

214.    Dr. Rabinowitz's mental health conditions, PTSD and complex grief, meet the definition of "disability" and "handicap" as they substantially limit one or more major life activities, including his ability to concentrate, communicate, think, sleep and work.   Dr. Rabinowitz was also "regarded as" disabled or handicapped, by the Defendants.

215.    Dr. Rabinowitz was, at all relevant times, able to perform the essential job functions with or without reasonable accommodation and therefore, was a qualified individual with a disability or "handicap" accepted into the Training Program.

216.    Defendants discriminated against Dr. Rabinowitz based on his handicap by failing to provide him with equal access to the Training Program and the Clinic, including failing to make reasonable accommodations and/or engage in an interactive process to allow him to fully participate in, and enjoy the benefits of, the Training Program and the work he performed for the Clinic.

217.    Defendants engaged in discrimination and disparate treatment toward Dr. Rabinowitz by treating him less favorably than his peers and not affording him various rights and privileges because of his handicap,  and by terminating him from the Training Program and the Clinic without following the requirements of applicable University policies, including the University's Disability Accommodation Policy, and the GME, RMC and ACGME policies and procedures.

218.    As a result of Defendants' discriminatory actions, Dr. Rabinowitz has suffered significant economic and non-economic damages, in an amount to be determined at trial.

## IX.   SEVENTH CLAIM FOR RELIEF

### Breach of Contract Against Defendant University

219.    Plaintiff incorporates all other paragraphs set forth fully herein.

220.    As set forth above, Dr. Rabinowitz and the University entered into an enforceable Training Agreement setting forth the respective terms and conditions of the contract for each party.

221.    As set forth above, the University agreed in the Training Agreement to comply with certain University employee policies, its GME Policies and Procedures and the ACGME Program Requirements in accepting Dr. Rabinowitz into the program.

222.    Dr. Rabinowitz agreed that he would be expected to satisfactorily meet his obligations under the Training Agreement to be successfully promoted each year of the program.

223.    Plaintiff performed his agreement by meeting the requirements of the Training Agreement, as applicable.

224.    Defendant University breached the agreement by terminating Dr. Rabinowitz from the Training Program without cause prior to his completion of his second year and by engaging in the following conduct:

a.    failing to adhere to GME Policies;

b.    failing to adhere to ACGME Program Requirements;

c.    failing to follow the University's Disability Accommodation Policy;

d.    failing to provide notice to Dr. Rabinowitz of his opportunity to respond to any allegations against him in support of disciplinary action and/or any opportunity for reasonable accommodation, remediation and/or probation;

e.    providing fictitious reasons to justify his termination from the program; and

f.      failing to apply the same criteria and standards to Dr. Rabinowitz that it applied to other successful program residents.

225.    By failing to observe the standards, criteria and procedures outlined in its own policies and the GME and ACGME Policies, Procedures and Requirements pertaining to medical residents, Defendants University and HealthONE d/b/a RMC did not perform what it so offered in the Training Agreement and thereby breached its contract with Dr. Rabinowitz.

226.    As a result of Defendant University's breach of contract, Dr. Rabinowitz has been damaged, in an amount to be determined at trial.

## X.   EIGHTH CLAIM FOR RELIEF

**Breach of Implied Covenant of Good Faith and Fair Dealing Against Defendant University**

227.    Plaintiff incorporates all other paragraphs set forth fully herein.

228.    The parties' Training Agreement is an enforceable contract. The terms of said contract task the University, and HealthONE d/b/a RMC, as the Affiliated Hospital, with the responsibility for affording Dr. Rabinowitz access to the University's policies and procedures, including all GME policies and procedures, and the ACGME Program Requirements.

229.    As a result of the contractual relationship between Dr. Rabinowitz and the University, the terms of the Training Agreement, and the expressed and implied promises made in connection with those terms and conditions and the parties respective obligations therein, and the acts, conduct and communications resulting in said promises, Defendant University implicitly promised to act in good faith toward and deal fairly with Dr. Rabinowitz in all matters associated with the terms of the  contract as a resident and in adherence to the applicable University policies, GME Policies and Procedures and ACGME Program Requirements.

230.    The Defendant University's refusal to perform under the terms of the Training Agreement was wrongful, in bad faith, and in violation of its respective duties and obligations.

231.    As a result of Defendants' breach of the covenant of good faith and fair dealing, Dr. Rabinowitz has suffered significant economic and non-economic losses.

## XI.   NINTH CLAIM FOR RELIEF

**Promissory Estoppel and Unjust Enrichment Against Defendants University and RMC**

232.    Plaintiff incorporates all other paragraphs set forth fully herein.

233.    The CUGME Program and RMC, as the Affiliated Hospital, made a promise to the Training Program residents, including Dr. Rabinowitz, that they would complete their education at the RMC Training Program based on satisfactory performance and that the Training Program's leadership would comply with University policies, the GME Policies and Procedures, and with the ACGME Program Requirements.

234.    Defendants University and RMC made various other promises to Plaintiff, including those set forth in the Training Agreement.

235.    Defendants placed an inexperienced administrator in the position of Program Leader, Dr. Webster, who made various mistakes in administering Plaintiff's participation in the Training Program.

236.    Defendants intended to include Plaintiff to accept his placement in the Residency Program, remain in the program, and trust that he would be treated in accordance with the law and his Training Agreement.

237.    Dr. Rabinowitz relied on the Defendants' promises in deciding to accept the residency at the University of Colorado and continuing with the program, and his reliance was reasonable and justified.

238.    Defendants breached their promises by failing to comply with the terms and conditions set forth in the University's policies, the GME Policies and Procedures and the ACGME Program Requirements Dr. Rabinowitz's mental health challenges as they arose, creating the False Suspension Letter and then terminating him from the Training Program, all without due process, thereby terminating his ability to continue his residency requirements to become a family medicine practitioner.

239.    Plaintiff's reliance was detrimental, and Defendants have been unjustly enriched by, among other things, not having to go through the expense and effort of accommodating Plaintiff and of placing him in a new training program once his Training Program was closed, and being permitted to retain funding for his placement even though he was not being trained at various times (when he was on leave, suspended, and terminated).

240.    The balance of the equities favors enforcement of the Defendants' promises.

241.    Plaintiff has been damaged in an amount to be determined at trial.

## XII.  <u>TENTH CLAIM FOR RELIEF</u>

### Fraudulent Representations and Concealment, Against All Defendants

242.    Plaintiff incorporates all other paragraphs set forth fully herein.

243.    Dr. Webster concealed the fact that she was placing Dr. Rabinowitz's on leave for disciplinary reasons, in their January 31, 2018 meeting in which she informed him that he would be placed on leave, and she concealed this fact intending to induce Plaintiff to take an action, namely to voluntarily agree to go on leave, that he would not have taken if he was aware of this fact.

244.    Dr. Webster also concealed the fact that the leave would be characterized as suspension, when told him that he should return to leave, on January 31, 2018, and she concealed

this fact intending to induce Plaintiff to take an action, namely to voluntarily agree to go on leave, that he would not have taken if he was aware of this fact.

245.   The above facts, that the leave was disciplinary and was specifically, a suspension from the Training Program, are each material.

246.   Dr. Webster concealed the facts set forth immediately above with the intention of creating a false impression of the actual facts in Dr. Rabinowitz's mind, namely that he was just being asked to go back on medical leave.

247.   In the January 31st meeting, Dr. Webster falsely represented to Dr. Rabinowitz that his leave would be just like the FML leave he took just a month prior, and she so falsely represented intending to induce Plaintiff to take leave voluntarily, which he would not have done if he know that the leave was not FML leave but instead disciplinary action in the form of a suspension.

248.   Dr. Webster's false representation regarding the nature of the leave, was material.

249.   Dr. Webster made this representation knowing that it was false and intended that Dr. Rabinowitz rely on the representation by consenting to the leave, as opposed to possibly exercising his due process rights to appeal being unlawfully suspended by the Training Program.

250.   Dr. Rabinowitz relied on Dr. Webster's representation that he was just being asked to go back on medical leave, and that the leave was not disciplinary, and his reliance was justified and reasonable.

251.   Dr. Rabinowitz went on medical leave voluntarily because he reasonably and justifiably relied on the false assumption that the leave was not disciplinary, created by Defendants based upon the fraudulent omissions set forth above.

252.   Dr. Rabinowitz trusted Dr. Webster's representations and omissions in their conversation during the January 31, 2018 meeting, and his reliance was justified and reasonable.

253.   Drs. Rumack and Webster conferred about and worked together in the fraudulent omissions and representations made to Plaintiff.

254.   After he went on leave, Dr. Webster and Dr. Rumack together, created the False Suspension Letter, did not inform Dr. Rabinowitz of this document or their intentions, and placed in Dr. Rabinowitz's personnel file the fictitious suspension.

255.   Dr. Rumack was aware Dr. Rabinowitz was placed on FML and not disciplinary suspension the month of February 2018 and willfully and wantonly engaged in the fraud

256.   Both Defendants had a duty to disclose the letter to Dr. Rabinowitz under the GME policies and procedures.

257.    The False Suspension letter contains various misrepresentations of material fact, including that Plaintiff had multiple performance and behavioral issues, that were used by Defendants to justify Plaintiff's suspension and later termination.

258.    Plaintiff was not informed that the False Suspension Letter would be created, nor of its contents, and Plaintiff relied on Defendants' characterization of his leave as FML as opposed to disciplinary, in agreeing to go on leave voluntarily and forgoing due process rights to appeal the termination, which he would not have otherwise done but for the false representations and omissions in the False Suspension Letter.

259.    Plaintiff could not refute any of the allegations in the False Suspension Letter because of Defendants' concealment.

260.    Plaintiff's reliance on the representations and omissions surrounding the False Suspension Letter was reasonable and justified.

261.    Plaintiff has been damaged by all of the Defendants' false representations and omissions detailed in this Complaint, in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor and against Defendants, and award the following relief:

    a.  Damages in such an amount as shall be proven at trial for economic loses and compensatory damages in an amount of at least $300,000.00 pursuant to federal and state anti-discrimination statutes;

    b.  Damages in such an amount as shall be proven at trial for non-economic losses, including emotional distress, humiliation, loss of reputation and anxiety;

    c.  Punitive damages as appropriate;

    d.  Injunctive and/or declaratory relief, including possible placement of Plaintiff in a Preventative Medicine program, to allow Plaintiff to complete his training;

    e.  Pre-judgment and post-judgment interest at the highest lawful rate;

    f.  Attorney's fees and costs of this action, including expert witness fees, as appropriate; and
Any such further relief as justice allows.

RESPECTFULLY SUBMITTED ON THIS SEVENTH DAY OF AUGUST, 2019.

                    By:    *s/ Patricia S. Bellac*
                            Patricia S. Bellac (#22447)
                            PATRICIA S. BELLAC LAW FIRM, LLC
                            4845 Pearl East Circle, Suite 101
                            Boulder, CO 80301
                            Telephone:  303-442-5111
                            Fax:  303-417-6381
                            E-mail:  psb@psblawfirm.com
                            *Attorney for Plaintiff*

Address of Plaintiff:
3539 Decatur Street
Denver, CO 80211