## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.: 1:19-cv-02616  WJM-STV

**AKIVA MEYER RABINOWITZ, a/k/a AKIVA THOMAS, DO**
Plaintiff,

v.

**Donald ("Don") M. Elliman, Chancellor, University of Colorado ("CU"), Anschutz Medical Campus ("Anschutz").**

Defendant.

_____

### SECOND AMENDED COMPLAINT AND JURY DEMAND
_____

Plaintiff Dr. Akiva Rabinowitz, DO, by and through his counsel of record,  Seth J. Benezra, John A. Culver, and Anna Fullerton of the law firm of Benezra & Culver, P.C., for his Second Amended Complaint against Donald ("Don") M. Elliman, Chancellor, University of Colorado ("CU") Anschutz Medical Campus ("Anschutz"), states and alleges as follows:

### I.   PARTIES, JURISDICTION AND VENUE

1.      The Plaintiff, Dr. Akiva Rabinowitz, DO is and at all times pertinent hereto a resident of the State of Colorado currently residing at 3539 Decatur Street, Denver, Colorado 80211.  In 2019, Dr. Rabinowitz changed his name to Akiva Thomas and he is now known by that name for all purposes.  In this complaint, Rabinowitz is used because that was his name at the time of all relevant events.

2.      Donald (Don) M. Elliman is the Chancellor of the University of Colorado ("CU") Anschutz Medical Campus.  The University of Colorado, through its counsel has stipulated that Donald M. Elliman is the proper Defendant for all of Plaintiff's claims against the University of Colorado.

3.      The University of Colorado School of Medicine ("UCSOM") operates a Graduate Medical Education Program ("CUGME"), a State of Colorado program of higher education at its Anschutz Medical campus located at 13001 East 17th Place, in Aurora, Colorado.

4.       In a joint venture with HCA-HealthONE d/b/a Rose Medical Center ("RMC")[1] and   UCSOM, the  CUGME  operated the RMC Family Medicine Residency Program (hereinafter the "Training Program" or "the Program") to employ and educate doctors working in the RMC Family Medicine Clinic ("Clinic) until the closure of the Training Program in June 2018.  The Training Program operated to the financial benefit of  the   USCOM in receiving direct and indirect Graduate Medical Education ("GME") funding from the various federally funded reimbursement programs.

5.       Dr. Rabinowitz was a paid resident of the Training Program employed by UCSOM CUGME. Dr. Rabinowitz also received medical training and education as part of the Training Program.

---

[1]  In this Second Amended Complaint, Plaintiff is no longer asserting claims against HealthONE LLC d/b/a Rose.

6.      The Court has jurisdiction in this matter because the Defendants filed a Notice of Removal in this action on September 13, 2019.  Removal was proper because the Plaintiff's lawsuit asserts claims for relief under Title I and Title II of the Americans with Disabilities as Amended  Act, Section 504 of the Federal Rehabilitation Act and the Family Medical Leave Act.   Venue is proper under 28 U.S.C. § 1441(a), because the state court where the suit was pending is located in this District.

## II.   FACTS

### A.      Dr. Rabinowitz's Outstanding Performance as a Medical Student; His Admission into the Highly Competitive Training Program and His Outstanding Performance in the Training Program

7.      Dr. Rabinowitz worked for the Defendant in the Training Program, from June 23, 2016 until April 6, 2018.  He also received education and training as part of that Program.

8.      Dr. Rabinowitz achieved his highly competitive placement  in the Program due to his laudatory academic credentials, including being a peer-reviewed author with an extensive biomedical research background in cognitive neuroscience and graduating at the top of his medical school class. His standardized examination scores on national medical licensing exams  placed him in the 90th percentile of medical students nationally. The dean of his medical school gave Dr. Rabinowitz her "highest recommendation," for continued success in graduate medical training.

9.      Dr. Rabinowitz successfully completed his first year in the Program, as a "rising star" as he was referred to in his June 2, 2017 performance review and promoted to his second year.

10.      Dr. Rabinowitz's evaluations contain many very positive observations and comments, at all relevant times in the Program. Within his first weeks  in  the Training program, he was noted to have "demonstrated great communication skills and maturity," and capable of "great change in response to feedback." His medical decision making was lauded as "easily on par" with residents 1- or 2-years ahead of him. He was noted to engage in "outstanding teamwork," and to "demonstrate an excellent amount of genuine empathy and compassion for his patients."

11.      As part of a standardized assessment taken by 1st and 2nd year Family Medicine residents to compare their performance to peers nationally, the In-Training Exam (ITE), Dr. Rabinowitz scored within the top 10% of all residents nationwide and generally outperformed his peers.

12.      Dr. Webster is the Program Director of the Training Program.  Dr. Webster was appointed to her position despite the fact she did not meet the Accreditation Counsel for Graduate Medical Education ("ACGME") Common Program Requirements and was never approved by the Graduate Medical Education Council at UCSOM, as required by the CUGME "Program Director Qualifications, Appointment & Approval."

13.      At all times relevant to this action, Defendant Carol M. Rumack was the Associate Dean of the CUGME Program whose varied responsibilities included close

administration and funding concerns for the affiliated residency programs, such as the Training Program,  chairing the Graduate Medical Education Committee, and administering disciplinary action to physicians in training at the UCSOM.

**B.**     <u>**Dr. Rabinowitz's Mother is Diagnosed With Stage 4 Cancer**</u>.

14.     In March 2017, Dr. Rabinowitz's previously healthy 53-year-old mother, his sole parent, was unexpectedly diagnosed with stage four cancer.  He moved her across the country to his home to act as her sole care provider.

15.     From her period of diagnosis in March 2017 until her death in October 2017, Dr. Rabinowitz  exhibited  a high level of competency in patient care at RFM and dutifully attended his rotations while caring for his terminally ill mother.

16.     Upon moving his mother back to Colorado in April of 2017 and returning almost immediately to his training obligations, Dr. Rabinowitz reached out to his faculty mentor, Dr. Vanessa Rollins, for mental health resources, a request she later admitted she had just ignored or failed to follow through on.

17.     Dr. Rabinowitz soon thereafter, in May 2017, engaged in community-based counseling to help him manage both his highly stressful work and home lives.

18.     In July 2017, Dr. Rabinowitz reported to his then close adviser, Dr. Webster, he was experiencing anxiety and panic attacks at work and was sent home early on two occasions.

19.     Dr. Rabinowitz's exceptional capacity to administer a high level of care was nonetheless evident as of September 2017, when the Program elected to allow him to achieve "batching privileges," requiring reduced oversight from the faculty to engage in patient care in the Clinic. This is normally reserved for 3rd year residents, and Dr. Rabinowitz achieved this distinction earlier than any resident in the program's history.

**C.     Dr. Rabinowitz's Mother Dies; Dr. Rabinowitz Experiences Complex Grief, Acute Traumatic Stress and is Diagnosed with PTSD.**

20.     Dr. Rabinowitz's gravely ill mother  passed in his presence in the early morning hours on October 24, 2017, a very personal and deeply traumatic event in the precipitous and unexpected manner it occurred.

21.     Dr. Rabinowitz took two weeks of vacation leave (November 1-14, 2017) to grieve and during that time he underwent  a previously planned surgical procedure at RMC on November 7, 2017.

22.     Dr. Rabinowitz was erroneously scheduled for a follow-up appointment the day after his surgery at 7:30 a.m. which he presumed was to check his bleeding wounds.  But for the error of a staff member in the surgeon's office, he would not have appeared at RMC that day.

23.     The surgeon's office was adjacent to the work room of the RMC inpatient residents.

24.     A fellow resident observed Dr. Rabinowitz that morning as "not acting as himself" and accompanied him to the surgeon's office front desk.

25.     Dr. Rabinowitz was told that the appointment was made in error, that he did not need follow up until several days later.  The resident then helped plan for Dr. Rabinowitz to safely return home.

26.     Based on that incident , Dr. Webster erroneously perceived Dr. Rabinowitz to have a substance abuse problem and referred him for treatment with the Colorado Physical Health Program ("CPHP").

27.     Dr. Rabinowitz went out on family medical leave ("FML") from November 15 until December 12, 2017 when CPHP cleared him to return to the Clinic.

28.     Upon his return, Dr. Webster placed him on a Focused Review, a form of discipline, because of what she perceived as a "failure to maintain [his] mental health," despite the fact he had appeared at RMC off-duty at his surgeon's direction one-day post operation.

29.     Dr. Webster's actions in punishing Dr. Rabinowitz  concerned  Dr. Rumack, who at all times relevant was Dr. Webster's supervisor.

30.     Dr. Rumack expressed at the time  her concern that the incident did not necessarily indicate a deficiency in performance but that the RMC program had not afforded Dr. Rabinowitz with adequate time off.

31.     Dr. Rabinowitz successfully attended counseling, performed evaluative testing and submitted to drug testing while under CPHP's care.

32.     CPHP concluded that what occurred on November 7, 2017 "was a one-time incident" and communicated this to Dr. Webster on December 12, 2017 stating that they found "no evidence Dr. Rabinowitz [sic] is suffering from a  . . .   including a substance abuse disorder …".

33.     CPHP providers determined Dr. Rabinowitz was "having an appropriate grief reaction to the acute, traumatic death" of his mother.

34.     When Dr. Rabinowitz returned to the Training Program, he performed his job duties without incident during the holiday season.

35.     Dr. Rabinowitz was suffering from not only complex grief but also symptoms begetting an emerging diagnosis of post-traumatic stress disorder (PTSD) relating to the trauma of his mother's death.

36.     Acute traumatic stress is known to have the potential to develop into Post-Traumatic Stress Disorder, especially in situations such as what Dr. Rabinowitz faced.

37.     PTSD is a mental illness predominantly characterized by markedly abnormal level of reactivity and diminished executive-cognitive functioning which governs healthy decision-making behavior.

38.     In mid-January 2018, Dr. Rabinowitz began experiencing flashbacks, feelings of guilt, and other emotional disturbances due to the trauma he had experienced weeks prior with the death of his mother and his actions to withdraw life-support.

39.     Dr. Rabinowitz reported these difficulties to Dr. Vanessa Rollins, Ph. D, who was his adviser at the time to mitigate the potential effects on his job performance.

40.     Despite his immense personal difficulties,  Dr. Rabinowitz's  performance was strong on outside rotations in Advanced Obstetrics in December 2017 and General Surgery during January 2018. His Advanced Obstetrics supervisor passed him in all categories and described him as an "excellent physician".   His General Surgery supervisor reported that he was hard-working, had a generous fund of knowledge, and was "kind to patients and very helpful in every regard."

41.     In addition to talking to Dr. Rollins, Dr. Rabinowitz also, on several occasions, let his supervisors and team know  that he continued to experience significant grief and that he was considering the need for additional time off.

42.     One of the doctors he reported to, Dr. Tyler Ladue, had a management style which was triggering Dr. Rabinowitz to feel overwhelmed.

43.     Dr. Rabinowitz's efforts to express his concerns and mental health medical needs to his supervisors, in particular Dr. Ladue, was interpreted as a job performance deficiency, and his mental health challenges a threat to the workplace rather than a condition which garnered legal protections - a mental health impairment caused by his disabilities.

44.     Dr. Rabinowitz's efforts to receive accommodation to help him perform his job duties were ignored by Dr. Webster and the Training Program and RMC's leadership which further exacerbated his symptoms.

45.     An example of this is when Dr. Rabinowitz made a simple request that Dr. Ladue only contact him in relation to topics relevant to administering safe and quality care to the program's patients as a measure to allow him to better manage the stress of his job.

46.     That request led to Dr. Rabinowitz being admonished in his next performance review.

47.     In addition to his personal challenges, there was ongoing tension rising among the faculty because it was becoming clear that the Training program was closing after June 30, 2018, creating uncertainty among the residents and staff as to their jobs and professional futures.  The Training Program leaders were becoming aware that they would have to find substitute placements for all of the returning residents, which they ultimately did for everyone but Dr. Rabinowitz.

48.     On January 11, 2018, while practicing in the Clinic, Dr. Rabinowitz made a simple error in processing a prior authorization for a patient to receive a Lidocaine patch and immediately reported his error to Dr. Webster in addition to other steps to address the issue.

49.     Within moments of committing the error, Dr. Rabinowitz was approached by the RMC's Lead Nurse, Cheryl Murphy, who was immediately aggressive with him despite his established record of highly professional behavior.

50.      Dr. Rabinowitz was then  investigated for Medicare fraud based on that one, isolated incident, which Dr. Webster describes in Dr. Rabinowitz's January 16th, 2018 training review as "a non-issue" to the Training Program but was escalated to the highest levels of the hospital administration "behind [her] back." Similarly situated non-disabled residents who committed similar errors were not treated in this fashion.

51.     On January 15, 2018, Dr. Rabinowitz engaged in a text message exchange with his Chief Resident asking for coverage to attend a therapy session for an hour and a half on his upcoming February 2018 rotation, where he serves as the senior admitting resident on the inpatient RFM service, arguably the most difficult rotation at the Training Program.  This request was denied.

52.     In addition, Dr. Ladue   denied  Dr. Rabinowitz's request to see his therapist on a weekly basis for an hour despite working an 80-hour per week schedule.

53.     Dr. Ladue's actions were in direct violation of the University's Leave Policy as well as the ACGME rules which reads: "**Well-Being** – Programs must provide the Resident with the opportunity to attend medical, mental health and dental care appointments, including those scheduled during their working hours."

54.     Dr. Rabinowitz's request was legally protected under the University's leave policy and should have been granted as FML.  It was also a request for a reasonable accommodation under the Americans with Disabilities As Amended Act, the Federal Rehabilitation Act, and Colorado Anti-Discrimination Act

**D.     Defendant Discriminates and Retaliates Against Dr. Rabinowitz by Placing Him on a Disciplinary Individualized Learning Plan ("ILP").**

55.     On January 16, 2018, Dr. Rabinowitz met with Dr. Webster for his bi-annual performance review.

56.      As of January 16, 2018, Dr. Webster  knew or reasonably should have known, from her communications with CPHP, that Dr. Rabinowitz suffered from complicated grief, a diagnosis which includes symptoms of anxiety, insomnia, panic attacks, depression, and trauma. In late February, 2018,  he was formally  diagnosed as suffering from PTSD.

57.     In  the January 16, 20189 meeting,  Dr. Rabinowitz discussed the difficulty he was having with Dr. Ladue in not being heard when he attempted to communicate his difficulty with keeping up with email and text communicating  in his job among other concerns.

58.     During the meeting, Dr. Rabinowitz further explained that Dr. Ladue's management style was exacerbating his symptoms and  requested an accommodation in prioritizing the emails and text communications he received on a daily basis as a means of coping.

59.     Instead of granting the accommodation, in the January 16, 2018 performance review meeting, Dr. Webster told Dr. Rabinowitz that he would be put on an individualized learning plan ("ILP"), a form of discipline for his "communication difficulties."

60.     Dr. Webster assured Dr. Rabinowitz that the ILP would be "nothing formal," that "everyone has one they are working on," and that aside from a few "speedbumps in the road," he was doing well.

61.     Dr. Rabinowitz's difficulties with Dr. Ladue aside, Dr. Rabinowitz continued to perform at a high level - his performance reviews at the time establish he otherwise was performing at or above expectations.

**E.     Dr. Rabinowitz is Suspended in Retaliation for Having Requested a Reasonable Accommodation.**

62.     Dr. Webster met with Dr. Rabinowitz on January 31, 2018.  In that meeting, she told him she was placing him back on FML  give him time to focus on his wellness.  She did not say that she was suspending him or that he was being subjected to further disciplinary action.

63.     In that meeting, Dr. Rabinowitz specifically asked Dr. Webster if the leave was the same as he took in December (FML) and was told that "yes, it was."

64.     It was Dr. Rabinowitz's understanding based on what he was told that he was being placed on medical leave to allow him time to address his ongoing complicated grief and trauma.

65.     Around the same time,  Dr. Webster sent an email to the residency staff explaining Dr. Rabinowitz was going to be out on "FMLA".

66.     A transition letter regarding closure of the RMC Training Program and addressing the continued employment of faculty and staff through reassignment to other GME programs was issued during that same time period by the "GME Team," CUGME and HealthONE d/b/a RMC and d/b/a TCHF, on February 15, 2018.

67.     The GME Team transition letter states that the transfer and realignment of RMC program staff began the same day Dr. Rabinowitz was placed on medical leave.

68.      Between 1/30/2018 and 2/15/2018 Dr. Webster and Dr. Rumack conferred and  created a "suspension letter".

69.     The fictitious suspension letter was placed in Dr. Rabinowitz's file without his knowledge.

70.     By fraudulently creating this suspension documentation and not informing Dr. Rabinowitz of it, Dr. Rabinowitz was induced to take leave under false pretenses and deprived of the right to appeal his suspension, a right that he would otherwise have based upon his contract and the Colorado constitution.

71.     The fictitiously created "suspension letter" (the "False Suspension Letter") was then used as "key" evidence to terminate him from the Training Program, in April 2018.

72.     The timing of the transition letter issued by the GME Team indicates that the creation of the False Suspension Letter and move towards termination of employment just as Dr. Rabinowitz was told he was being placed on FML likely was

done to avoid the GME Team having to find him a new placement, as was provided to other similarly situated residents, and thereby avoid having to accommodate his disability.

73.     The False Suspension Letter is evidence that the University's claimed reasons for failing to accommodate, suspending and terminating Dr. Rabinowitz are pretextual.

74.     Dr. Rabinowitz first learned of the False Suspension Letter after he had already been terminated.

75.     The date appearing on the letter, January 31, 2018, is backdated.

76.     The False Suspension Letter  includes allegations of performance deficiencies which are not true,  cited  "multiple reports of unprofessional behavior" which are unsupported by the evidence.

77.     The University has in place specific procedures for addressing resident performance under its Remediation and Disciplinary Action Policy (the "Policy").  Dr. Rabinowitz was never afforded those rights.

78.     The policy  states  that immediate suspension from clinical responsibilities without prior notice or a probationary/remedial period can only occur in circumstances involving "significant deficiencies related to patient safety."

79.     The grounds given in support of a suspension in the fictitious suspension letter are "deficiencies in professionalism and interpersonal communications."

80.     The letter does not state, and there is no evidence to show, that Dr. Rabinowitz presented any danger to patients.  Rather, it is clear from his performance

evaluations and clinical record that as a physician Dr. Rabinowitz was performing at or above expectations and that he values patient care.

81.     In comparison, another resident in the Training Program who did not have an identified mental health impairment was given considerable leeway under the University's Physician Impairment Policy to accommodate performance issues he was having which related to real substance abuse.

82.     Dr. Webster has stated, in comparing situations, that she was not "afraid" of Dr. Rabinowitz's nondisabled peer which she implied to mean she perceived Dr. Rabinowitz to be a "threat" because of his cry for help when he was having performance difficulties because of his mental health disability.

83.     Nothing Dr. Rabinowitz said, as set forth above, indicated a bona fide threat to the physical safety of Dr. Webster or anyone else.

### F.     Defendant Terminates Dr. Rabinowitz for Pretextual Reasons.

84.     To the best of Dr. Rabinowitz's knowledge and with support in his file, he was placed on FML effective February 1, 2018 and again referred to CPHP.

85.     On February 27, 2018, CPHP informed Dr. Webster that Dr. Rabinowitz was suffering from complicated grief and, that although he was feeling better, he had agreed to take an additional 30 days, the month of March, off from training to continue to get well before he returned to the clinical setting.

86.     Dr. Rabinowitz was scheduled for a follow up appointment on March 15, 2018 and based on CPHP's recommendation his leave was extended until April 1, 2018.

87.     When Dr. Webster reached out to CPHP on or about April 6, 2018 to receive CPHP's approval for Dr. Rabinowitz's return, she was informed he was not able to return quite yet.

88.     On information and belief, Dr. Rabinowitz's care provider was on vacation at the time and that is why the paperwork for his return was not available.

89.     No interactive process was ever offered to explore whether Dr. Rabinowitz would be able to return on a date certain soon thereafter, as is required by CADA and the ADA as a form of reasonable accommodation.

90.     On April 6, 2018 Dr. Rabinowitz was summarily terminated from the Training Program.

91.     The termination decision was ostensibly  based, in part, on  an incident on March 14, 2018 when Dr. Rabinowitz was required to report to work during his medical leave of absence.

92.     It was observed that Dr. Rabinowitz appeared to "not be himself" that day.

93.     As with the incident in November 2017, it was again assumed that Dr. Rabinowitz was in an intoxicated state when he appeared at RMC in an altered emotional state while on medical leave on Wednesday, March 14, 2018.

94.     The termination letter  identifies the bases for the decision as  "repeated episodes of intoxication" and the loss of 3 months of clinical experience (job protected FML Leave).

95.     Dr. Webster erroneously states in the termination letter that Dr. Rabinowitz was under Focused Review when he was terminated from the Training Program.

96.    The only Focused Review in Dr. Rabinowitz's personnel file is the one issued in December 2017 from which he was released on January 16, 2018.

97.    The Focused Review letter specifically reads that any further discipline could only be imposed "[s]hould you fail to meet the terms of your focused review at any point in time during the review period," (i.e., through December 31, 2017).

98.    Dr. Rabinowitz was asked by the RMC program leadership to attend two meetings on March 14, 2018, one a strategy-focused resident meeting at RMC during the day and the Graduate Medical Education Committee ("GMEC") meeting later that evening at the CU Anschutz facility.

99.    This was despite the fact Dr. Rabinowitz was known to be on FML for medical reasons relating to his mental health.

100.    At the time, Dr. Rabinowitz's PTSD symptoms and complex grief had become exacerbated by the approaching anniversary of his mother's diagnosis and he was unable sleep to due to raging anxiety and flashbacks.

101.    Dr. Rabinowitz was working with his treatment providers to adjust his medications to alleviate the symptoms and stabilize his mental state.

102.    When Dr. Rabinowitz appeared at RMC, as requested, he was extremely vulnerable emotionally and unable to articulate that he was in the midst of a mental health crisis because after three sleepless nights he had no awareness that this was what was going on.

103.    Dr. Webster was aware that at the time Dr. Rabinowitz was subject to substance abuse testing through CPHP, all results of which confirmed he was not abusing drugs.

104.    Dr. Rabinowitz was subject to random drug testing by CPHP throughout his medical leave, including hair sample testing just after the March 14, 2018 incident with no positive results ever recorded.

105.    The hair sample screening included testing for marijuana, opiates and opioids, benzodiazepines, alcohol, sleeping pills, PCP, ketamine and barbiturates with all test results being negative. The testing would have detected any drug use for the 3-6 months prior to the screening.

106.    At no time did Dr. Rabinowitz test positive for drug abuse, yet he was labeled and accused of being a drug abuser.

**G.    Dr. Rabinowitz's Termination Violated Provisions of The Training Agreement Between the Parties.**

107.    At all times relevant, Dr. Rabinowitz, CU Anschutz and HealthONE d/b/a RMC as the affiliated hospital were parties to a Training Agreement ("Training Agreement") signed by Dr. Rabinowitz, on April 15, 2017.

108.    The Training Agreement, effective July 1, 2017 through June 30, 2018, formed an enforceable contract setting forth the terms and conditions of the Training Program and the parties' respective obligations therein.

109.    Under the Training Agreement, Dr. Rabinowitz was expressly provided "the right to the processes of promotion, evaluation, probation, remediation, suspension, non-renewal, dismissal and grievance as described in the [GME] Policies and Procedures."

110.    Those policies and procedures, including without limitation the GME Remediation and Disciplinary Policy, Leave Policy, and Physical Impairment Policy, were not complied with in addressing Dr. Rabinowitz's mental health limitations when performing his job duties at the clinic and otherwise participating in the Training Program. The Training Program was also subject to ACGME requirements.

111.    Similarly, the GME policies and procedures were not complied with by the Defendants in making the decision to terminate Dr. Rabinowitz from the Training Program.

112.    The Training Agreement,  paragraph 15, afforded Dr. Rabinowitz the protection of the  UCSOM CUGME policy on Disability Accommodation which protection was denied with no interactive process being offered and no reasonable accommodations being provided.

113.    CU Anschutz  had a duty to explore reasonable accommodations and to take additional remedial steps before terminating Dr. Rabinowitz from the program.

114.    Dr. Webster and others in the Training Program's Leadership ostensibly perceived Dr. Rabinowitz to be abusing drugs yet failed to afford him the protections of

USCOM CUGME  Physician Impairment Policy and Drug Screen Policy by providing him with emergent evaluation and drug screening.

115.    Rather than follow the USCOM CUGME  policies and procedures, Defendant acted on prejudicial assumptions without evidence to substantiate their claim that Dr. Rabinowitz had a drug problem.

116.    Defendant failed to provide  Dr. Rabinowitz  with an  emergent evaluation which could have ruled out substance abuse, in accordance with the University's Drug Screening Policy

117.    The UCSOM CUGME Remediation and Disciplinary Action policy states that "termination is typically preceded by probation . . ." and that "drug or alcohol abuse" is an item that "require[s] that a [resident] be put on probation . . ."

118.    Dr. Rabinowitz was never placed on probation nor allowed the procedural rights available to challenge such a decision which would have allowed him to prove he was not abusing drugs.

119.    Plaintiff had a valid expectancy that his continued employment with the Training Program and successful completion of the same would be governed by the policies, guidelines and criteria promulgated by CU Anschutz. .

120.    Dr. Rabinowitz has not been able to return to the University and complete his residency because  CU Anschutz  has been unwilling to appoint him to a suitable comparable training program.

121.    Both Dr. Webster and Dr. Rumack have spread untrue gossip, rumors and innuendo about Dr. Rabinowitz that has been highly prejudicial to his ability to be successful in a HCA-HealthONE affiliated program.

122.    CU Anschutz  has taken no action to cure the actions of Drs. Webster and Rumack which remain ongoing and involve slanderous and defamatory statements about Dr. Rabinowitz and his fitness to practice medicine, including rumors that he is unfit to be a doctor and a "drug addict,"  causing irreparable and permanent damage to his professional reputation and ability to successfully and safely return to the University.

123.    Dr. Rabinowitz filed Charges Nos. FE2019332354, 32A-2019-00021, FE2019292592, 32A2019 00022 against the University, with the Colorado Civil Rights Division on October 1, 2018, alleging discrimination on the basis of disability, religion, gender and sexual orientation, and retaliation in violation of the ADA, Title VII of the Civil Rights Act of 1964 and the Colorado Anti-Discrimination Act.  He  received Right to Sue letters from the CCRD, on May 20, 2019 and the EEOC, on July 21, 2019.

124.    On October 3, 2018, Dr. Rabinowitz timely served his Colorado Governmental Act Immunity Notice.

## FIRST CLAIM FOR RELIEF

### Disability Discrimination in Violation of The Colorado Anti-Discrimination Act, Section 24-34-101, et seq.

**Against Dr. Donald M.  Elliman, Chancellor, CU Anschutz.**

125.    Plaintiff incorporates all other paragraphs set forth fully herein.

126.    Defendant is an employer subject to the CADA, § 24-34-401, *et seq*.

127.    Dr. Rabinowitz was an employee of the Defendant under CADA and is entitled to the protection of the CADA as a qualified individual with disabilities.

128.    Dr. Rabinowitz's mental health conditions including PTSD, complex grief, anxiety, insomnia, panic attacks and depression meet the definition of "disability" under the CADA as they substantially limit one or more major life activities, including the ability to concentrate, think, communicate, sleep and also to work.  Dr. Rabinowitz was at all relevant times, able to perform the essential job functions of his position with or without reasonable accommodation.

129.    The Defendant was aware that Dr. Rabinowitz suffered from these disabilities.  Dr. Rabinowitz was also "regarded as" and had a "record" of impairments or disability within the meaning of the CADA.

130.    The Defendant failed to make a reasonable accommodation for Dr. Rabinowitz's disabilities and/or engage in an interactive process as required by the CADA.

131.    The Defendant engaged in discrimination toward Dr. Rabinowitz by treating him less favorably than his non-disabled peers because of his disabilities, by

not affording him the protections otherwise afforded to those with perceived substance abuse problems, by suspending him under false pretenses and without due process and by terminating him from the Training Program without following the requirements of the Training Program, including but not limited to the UCSOM Disability Accommodation Policy, GME, RMC and ACGME policies and procedures.

132.    Defendant's actions herein were intentional and taken with malice or with reckless disregard or indifference to the rights of Dr. Rabinoowitz.

133.    As a result of Defendant's discriminatory actions, Dr. Rabinowitz has suffered economic and non-economic damages, compensatory damages, including emotional distress and has incurred attorneys' fees and costs in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF

**Disability Discrimination in Violation of the Title I of the
Americans with Disabilities Act of 1990 (ADA)
Against Defendants Daniel M. Elliman, Chancellor, University of Colorado ("CU")
Anschutz Medical Campus, in his official capacity only and for prospective relief
only.**

134.    Plaintiff incorporates all other paragraphs set forth fully herein.

135.    Defendant is an  "employer" subject to Title I of the ADA, 42 U.S.C. § 121101, et seq. as amended.

136.    Dr. Rabinowitz's mental health conditions, PTSD, complex grief, anxiety, insomnia, panic attacks and depression meet the definition of "disabilities" under the

ADA, as they substantially limit one or more major life activities, including his ability to concentrate, communicate, think, sleep and work.

137.    Dr. Rabinowitz was, at all relevant times, able to perform the essential job functions of his position with or without reasonable accommodations.

138.    The Defendant was aware that Dr. Rabinowitz suffered from these disabilities.  Dr. Rabinowitz was also "regarded as" having an impairment, within the meaning of the ADA.  Dr. Rabinowitz also had a record of impairment and disability.

139.     The Defendant failed  to make reasonable accommodations for Dr. Rabinowitz's disabilities and/or engage in an interactive process as required by Title I of the Americans with Disabilities Act, 42 U.S.C. §§ 12101, et. seq, as amended.

140.    Defendant engaged in discrimination  toward Dr. Rabinowitz by treating him less favorably than his non-disabled peers because of his disabilities, not affording him the protections available under  University policy for (perceived) substance abuse problems, by suspending him under false pretenses and without due process and by terminating him from the Training Program without following the requirements of The Training Program, including but not limited to,   the UCSOM Disability Accommodation Policy,  GME, RMC and ACGME policies and procedures.

141.     Defendants' actions herein were motivated and taken with malice or with reckless disregard and/or indifference to the rights of Dr. Rabinowitz.

142.    Dr. Rabinowitz seeks prospective injunctive relief from Defendant Elliman, Chancellor, CU Anschutz  for instatement/reinstatement to a residency or fellowship

program that will lead to specialty certification under the American Board of Medical Specialties ("ABMS") and for his attorneys' fees and costs in pursuing this claim.

### THIRD CLAIM FOR RELIEF

**Public Accommodation Discrimination in Violation of Title II of the ADA Against Donald (Don) Elliman, Chancellor CU Anschutz.**

143.    Plaintiff incorporates all other paragraphs set forth fully herein.

144.     CU Anschutz is a state institution of higher education offering the Training Program as a public educational opportunity subject to the requirements of Title II of the ADA, 42 U.S.C. §§ 12101, *et.seq.*, as amended.  Dr. Rabinowitz was a participant in The Training Program.

145.    Dr. Rabinowitz's mental health conditions, PTSD, complex grief,  anxiety, insomnia, panic attacks and depression meet the definition of "disability" under the ADA, as they substantially limit one or more major life activities, including his ability to concentrate, communicate, think, sleep and work.   The Defendant was aware of Dr. Rabinowitz's disabilities.

146.    Dr. Rabinowitz was also "regarded as" having disabilities, within the meaning of the statute.  Dr. Rabinowitz also had a "record" of impairment or disabilities.

147.    Dr. Rabinowitz was, at all relevant times, a qualified individual with a disability entitled to full participation and access to the privileges and benefits of the Training Program having been accepted into the program after meeting its essential

eligibility requirements. Dr. Rabinowitz also was, at all relevant times, able to perform the essential job functions of the Training Program with or without reasonable accommodation.

148.    Defendant discriminated against Dr. Rabinowitz based on his disabilities by failing to provide him with equal access to the Training Program because of his disabilities including failing to  make reasonable accommodations for his disability and/or engage in an interactive process to allow him to fully participate in, and enjoy the benefits of, the Training Program in violation of Title II of the ADA.

149.    Defendant engaged in discrimination and disparate treatment toward Dr. Rabinowitz by treating him less favorably than his non-disabled  peers because of his disabilities,  by not affording him the protections available under University policies, for (perceived) substance abuse problems, by not following its various policies that would have afforded him protections, by suspending him under false pretenses and without due process and by terminating him from the Training Program without following the requirements of The Training Program, including, but not limited to, the USCOM, GME, and ACGME policies and procedures.

150.    As a result of Defendants' discriminatory actions, Dr. Rabinowitz has suffered significant economic and non-economic damages, compensatory damages, including emotional distress and has incurred attorneys fees and costs, all in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF

**Public Accommodations Discrimination in Violation of CADA**
**Against Defendant  Donald (Don) M. Elliman, Chancellor CU Anschutz**

151.    Plaintiff incorporates all other paragraphs set forth fully herein.

152.    The Defendant is a place of public accommodation subject to CADA, §§ 24-34-601, *et. seq*, C.R.S.

153.    Dr. Rabinowitz's mental health conditions, PTSD,  complex grief, anxiety, insomnia, panic attacks and depression meet the definition of "disabilities" under the ADA, as they substantially limit one or more major life activities, including his ability to concentrate, communicate, think, sleep and work.  The Defendant was aware of Dr. Rabinowitz's disabilities.

154.    Dr. Rabinowitz was, at all relevant times, a qualified individual with disabilities  entitled to full participation and access to the privileges and benefits of the Training Program having been accepted into the program after meeting its essential eligibility requirements.  Dr. Rabinowitz also was, at all relevant times, able to perform the essential job functions with or without reasonable accommodation.

155.    Dr. Rabinowitz was also regarded as having disabilities, by the Defendant. Dr. Rabinowitz also had a record of disability or impairment.

156.    Defendant discriminated against Dr. Rabinowitz based on his disabilities by failing to provide him with equal access to the Training Program because of his

28

disability, including failing to make reasonable accommodations and/or engage in an interactive process to allow him to fully participate in, and enjoy the benefits of, the Training Program.

157.   Defendant engaged in discrimination and disparate treatment toward Dr. Rabinowitz by treating him less favorably than his peers because of his disability.,

158.   Defendant engaged in discrimination and disparate treatment toward Dr. Rabinowitz by , by not affording him the protection available under University policies for (perceived) substance abuse problems, by suspending him under false pretenses and without due process, and by terminating him from the Training Program without following the requirements of applicable University policies, including its Disability Accommodation Policy, and the GME, RMC and ACGME policies and procedures.

159.   Defendant's unlawful actions were intentional and taken with malice and/or reckless disregard or indifference to the rights of Dr. Rabinowitz.

160.    As a result of Defendant's discriminatory actions, Dr. Rabinowitz has suffered significant economic and non-economic damages, compensatory damages, including emotional distress and has incurred attorneys fees and costs, all in an amount to be determined at trial.

### FIFTH  CLAIM FOR RELIEF

**Unlawful Retaliation  for Exercising Rights under  the  CADA
Against Defendant Donald M. Elliman, Chancellor, CU Anschutz.**

161.   Plaintiff incorporates all other paragraphs set forth fully herein.

162.    Plaintiff engaged in the protected activity of asking for reasonable accommodation pursuant to the CADA for his mental health impairments, at various times as set forth more fully above.

163.    Defendants retaliated against Plaintiff by treating him differently than other similarly situated residents that had not requested an accommodation, by not affording him the protections available under University policy for (perceived) substance abuse problems, by suspending him under false pretenses and without due process, and by terminating him from the Training Program without following the requirements of applicable University policies, including its Disability Accommodation Policy, and by the GME, RMC, and ACGME policies and procedures.

164.    Defendants would not have taken those said adverse employment actions against Dr. Rabinowitz but for the fact that he engaged in the protected activity of seeking reasonable accommodation for his disability, to which he was entitled under the CADA.

165.    Defendants' unlawful actions were intentional and taken with malice and/or reckless disregard or indifference to the rights of Dr. Rabinowitz.

166.    As a result of Defendants' retaliatory actions, Dr. Rabinowitz has suffered significant economic and non-economic damages, compensatory damages to include emotional distress and has incurred attorney fees and costs, all in an amount to be determined at trial.

**SIXTH CLAIM FOR RELIEF**

**Unlawful Retaliation Under Title I of The ADA for Engaging in Protected Activity Under the ADA  Against Defendant Donald M. Elliman, Chancellor of CU Anschutz in his official capacity for prospective relief only.**

167.    Plaintiff incorporates all Paragraphs as though fully set forth herein.

168.    Plaintiff engaged in the protected activity of asking for reasonable accommodation pursuant to the ADA for his mental health impairment, at various times as set forth more fully above.

169.    Defendants retaliated against Plaintiff by treating him differently than other similarly situated residents that had not requested an accommodation, by not affording him the protections available under University policy for (perceived) substance abuse problems, by suspending him under false pretenses and without due process, and by terminating him from the Training Program without following the requirements of applicable University policies, including its Disability Accommodation Policy, and by the GME, RMC, and ACGME policies and procedures.

170.    Defendant would not have taken those said adverse employment actions against Dr. Rabinowitz but for the fact that he engaged in the protected activity of seeking reasonable accommodation for his disability, to which he was entitled under the ADA.

171.    Defendant's unlawful actions were intentional and taken with malice and/or reckless disregard or indifference to the rights of Dr. Rabinowitz.Plaintiff seeks prospective injunctive relief for instatement/reinstatement to a residency or fellowship program that will lead to specialty certification and for his attorneys fees and costs.

## SEVENTH  CLAIM FOR RELIEF

**Discrimination and Retaliation in Violation of Section 504
of the Rehabilitation Act of 1973
Against Defendants Donald Elliman Chancellor of CU Anschutz**.

172.    Plaintiff incorporates all other paragraphs set forth fully herein.

173.    The  Defendant's UCSOM, CUGME Program  was supported in part by federal grants and funding programs.  The Training Program was itself supported in part by funded grants and funding programs.

174.    To the best of Dr. Rabinowitz's knowledge, the University and TCHF   also received federal financial assistance to operate the Clinic.

175.    Dr. Rabinowitz's mental health conditions, PTSD and complex grief, meet the definition of "disability" and "handicap" as they substantially limit one or more major life activities, including his ability to concentrate, communicate, think, sleep and work. The Defendant was aware of Dr. Rabinowitz's disabilities.   Dr. Rabinowitz was also "regarded as" disabled or handicapped, by the Defendants and had a record of disability or impairment.

176.    Dr. Rabinowitz was, at all relevant times, a qualified individual with a disability or "handicap" entitled to full participation and access to the privileges and benefits of the Training Program having been accepted into the program after meeting its essential eligibility requirements.  Dr. Rabinowitz also was, at all relevant times, able to perform the essential job functions with or without reasonable accommodation.

177.    Defendants discriminated against Dr. Rabinowitz based on his handicap by failing to provide him with equal access to the Training Program and the Clinic, including failing to make reasonable accommodations and/or engage in an interactive process to allow him to fully participate in, and enjoy the benefits of, the Training Program and the work he performed for the Clinic.

178.    Defendants discriminated and  retaliated against Dr. Rabinowitz in violation of the Rehabilitation Act of 1973,  by treating him less favorably than his non-disabled peers and his peers who did not request an accommodation.  The discrimination and retaliation included not affording Dr. Rabinowitz the protection available under University policy for (perceived) substance abuse problems, by suspending him under false pretenses and without due process and by terminating him from the Training Program without following the applicable University policies, including its Disability Accommodation Policy and the GME, RMC and ACGME policies and procedures.

179.    Defendants would not have taken those said adverse employment actions against Dr. Rabinowitz but for the fact that he engaged in the protected activity of seeking reasonable accommodation for his disability,

180.    As a result of Defendants' discriminatory actions, Dr. Rabinowitz has suffered significant economic and non-economic damages, compensatory damages and has incurred attorneys' fees and costs, in an amount to be determined at trial.

### EIGHTH CLAIM FOR RELIEF

**Breach of Contract**
**Against Defendant Donald M. Elliman, Chancellor CU Anschutz.**

181.    Plaintiff incorporates all other paragraphs set forth fully herein.

182.    As set forth above, Dr. Rabinowitz and the Defendant  CU Anschutz entered into an enforceable Training Agreement setting forth the respective terms and conditions of the contract for each party.

183.    As set forth above, the Defendant CU Anschutz  agreed in the Training Agreement to comply with certain University employee policies, its GME Policies and Procedures and the ACGME Program Requirements in accepting Dr. Rabinowitz into the program.

184.    Dr. Rabinowitz agreed that he would be expected to satisfactorily meet his obligations under the Training Agreement to be successfully promoted each year of the program.

185.    Plaintiff performed his agreement by meeting the requirements of the Training Agreement, as applicable.

186.    Defendant  CU Anschutz breached the agreement by terminating Dr. Rabinowitz from the Training Program without cause prior to his completion of his second year and by engaging in the following conduct:

a.    failing to adhere to GME Policies;

b.    failing to adhere to ACGME Program Requirements;

c.    failing to follow the University's Disability Accommodation Policy;

d.    failing to provide notice to Dr. Rabinowitz of his opportunity to respond to any allegations against him in support of disciplinary action and/or any opportunity for reasonable accommodation, remediation and/or probation;

e.    providing fictitious reasons to justify his termination from the program; and

f.    failing to apply the same criteria and standards to Dr. Rabinowitz that it applied to other successful program residents.

187.    By failing to observe the standards, criteria and procedures outlined in its own policies and the GME and ACGME Policies, Procedures and Requirements pertaining to medical residents, Defendant did not perform what it so offered in the Training Agreement and thereby breached its contract with Dr. Rabinowitz.

188.    As a result of Defendant's  breach of contract, Dr. Rabinowitz has been damaged, in an amount to be determined at trial.

### NINTH CLAIM FOR RELIEF

**Promissory Estoppel**
**Against Defendant Donald Elliman, Chancellor, CU Anschutz.**

189.    Plaintiff incorporates all other paragraphs set forth fully herein.

190.    CU Anschutz made a promise to the Training Program residents, including Dr. Rabinowitz, that they would complete their education at the RMC Training Program based on satisfactory performance and that the Training Program's leadership would comply with CU Anschutz   policies, including, but not limited to, the  USCOM CULME  GME Policies and Procedures, and with the ACGME Program Requirements.

191.    Defendant CU Anschutz  made various other promises to Plaintiff, including those set forth in the Training Agreement.

192.    Defendant CU Anschutz  placed an inexperienced administrator in the position of Program Leader, Dr. Webster, who made various mistakes in administering Plaintiff's participation in the Training Program.

193.    Defendant CU Anschutz  intended to induce   Plaintiff to accept his placement in the Residency Program, remain in the program, and trust that he would be treated in accordance with the law and his Training Agreement.

194.    Dr. Rabinowitz relied on the Defendant's promises in deciding to accept the residency at the University of Colorado and continuing with the program, and his reliance was reasonable and justified.

195.    Defendant breached its  promises by failing to comply with the terms and conditions set forth in the University's policies, including, but not limited to, the GME Policies and Procedures and the ACGME Program Requirements as Dr. Rabinowitz's

mental health challenges  arose, creating the False Suspension Letter and then terminating him from the Training Program, all without due process, thereby terminating his ability to continue his residency requirements to become a family medicine practitioner.

196.    Plaintiff's reliance was detrimental.

197.    The balance of the equities favors enforcement of the Defendants' promises to prevent injustice .

198.    Plaintiff has been damaged in an amount to be determined at trial.

## TENTH  CLAIM FOR RELIEF

**Violation of the Family Medical Leave Act of 1993**
**Against Defendants Donald M. Elliman, Chancellor, CU Anschutz in his official capacity only for prospective relief**

199.    Plaintiff incorporates all other paragraphs set forth fully herein.The Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. §§ 2601, *et. seq.*, prohibits an employer from interfering with or discriminating against an employee's exercise of his/her right under the Act to a period of unpaid leave because of a serious health condition.

201.    At all times relevant to the dispute, Defendants  were  "covered employer[s]" under the FMLA  as  employers engaged in commerce or in an industry affecting commerce  employing  fifty (50) or more employees for each working day

during each of the twenty (20) or more calendar workweeks in the current or preceding calendar year.

202.    At all times relevant to the dispute, Dr. Rabinowitz was an "eligible employee" under the FMLA having been employed by the Training Program for at least twelve months and having worked at least 1,250 hours during the previous twelve-month period.

203.    A serious health condition is defined by the FMLA to include an illness, injury, impairment or physical or mental condition that involves continuing treatment by a health care provider that results in an incapacity (inability to work, attend school, or participate in other daily activities) of more than three consecutive calendar days with either two or more in-person visits to the health care provider within 30 days of the date of incapacity.

204.    At all times relevant to the dispute, Plaintiff suffered from a serious health condition as defined by the FMLA following the traumatic death of his mother in October 2017.

205.    That he suffered from a serious health condition is supported by the fact Dr. Rabinowitz was placed on FML and under the care of CPHP as early as November 2017 as set forth more specifically above.

206.    In January 2018, when Dr. Rabinowitz was again having difficulties coping with his grief and gave notice of such difficulties and his need for leave to get self-care,

notice given  to his supervisors and Ms. Rollins, his rights to FMLA leave were interfered with when he was denied his right to FML, further exacerbating his serious health condition.

207.    On February 1, 2018, Dr. Rabinowitz was ostensibly placed on FML for self-care but then subject to discrimination and retaliation for engaging in such protected activity, for exercising his rights under the Act, as evidenced by the creation of the False Suspension Letter around that same time.

208.    In creating the False Suspension Letter, Defendants acted with procedural irregularity and contrary to written policy.

209.    As a result of the Defendants' discriminatory and retaliatory actions in violation of Dr. Rabinowitz's rights under the FMLA, Plaintiff has suffered damages in an amount to be determined at trial.

210.     Plaintiff seeks prospective injunctive relief from Defendant Elliman to include instatement or reinstatement to a residency or fellowship program that will lead to specialty certification under the American Board of Medical Specialties ("ABMS") and for his attorneys' fees and costs in pursuing these claims.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor and against Defendants, and award the following relief:

a.  Damages in such an amount as shall be proven at trial for economic losses;

b.  Damages in such an amount as shall be proven at trial for non-economic losses, compensatory damages, emotional distress, humiliation, loss of reputation and anxiety;

c.  Injunctive and/or declaratory relief;

d.  Pre-judgment and post-judgment interest at the highest lawful rate;

e.  Attorney's fees and costs of this action, including expert witness fees, as appropriate;

f.  Prospective injunctive relief on Plaintiff's Second, Sixth, and Tenth Claims for Relief;  and

g.  Any such further relief as justice allows.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

RESPECTFULLY SUBMITTED this 3rd day of December, 2019.

**BENEZRA & CULVER, P.C.**

*/s/ Seth J. Benezra*
_____
Seth J. Benezra, Esq.
John A. Culver, Esq.
Anna C. Fullerton, Esq.
633 17th St., Suite 1450
Denver, CO 80202
Telephone: (303) 716-0254
sjbenezra@bc-law.com
jaculver@bc-law.com
acfullerton@bc-law.com
*Attorney for Plaintiff*

Address of Plaintiff:
3539 Decatur Street
Denver, CO 80211